1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ZIMMERI CONTRERAZ, individually, | CASE NO. 3:22-cv-05106 |
| Plaintiff, | ORDER |
| v. | |
| CITY OF TACOMA, a municipal corporation; SOUTH SOUND 911, an interlocal agreement agency; and, CHRISTOPHER BAIN, in his individual capacity, | |
| Defendants. | |

## 1.  INTRODUCTION

Before the Court are cross-motions for summary judgment: Plaintiff Zimmeri Contreraz moves for partial summary judgment on his Washington Public Records Act claim against Defendant City of Tacoma; the City and Defendant Christopher Bain move for complete dismissal of Contreraz's case. Dkt. Nos. 83, 92. The Court has reviewed the papers submitted in support of and in opposition to the motions, heard oral argument from the parties, and is otherwise completely informed. For

the reasons explained below, the Court GRANTS Contreraz's motion in part, Dkt. No. 83, and DENIES the City's motion in its entirety, Dkt. No. 92.

## 2. BACKGROUND

Around 8:30 p.m. on July 12, 2020, the Tacoma Police Department (TPD) received a report that two men—one white, one black—were threatening someone near the basketball courts at Tacoma's Wright Park. Dkt. No. 104; Dkt. No. 105 at 25, 27. The white suspect was described as having blonde or brown hair, facial hair, and wearing a black shirt. *Id.* He was also reportedly carrying a small, black gun. *Id.* The black suspect was described as "buff," wearing a gray tank top, long black shorts, and a do-rag. *Id.* He was reportedly carrying a knife. *Id.*

Multiple TPD police officers responded to the report of the armed suspects, including officers Joel Cheney (now deceased), Erik Levitt, John Branham, and Defendant Christopher Bain. *See* Dkt. No. 85. The officers found Contreraz sitting at a picnic table in Wright Park and identified him as a suspect because, in the officers' view, Contreraz fit the description of one of the suspects as a black male wearing a black tank top, a black baseball cap worn backwards, and possessing a muscular build. *Id.* ¶ 7. Contreraz also wore red shorts and a facemask. *Id.* The TPD officers detained Contreraz and placed him in handcuffs. Dkt. 105 at 47-48, 51.

Contreraz was seated on the edge of the picnic table, but at some point, Bain alleges that Contreraz stood, took a step forward and started to lean in towards another officer, so Bain reacted by grabbing Contreraz's handcuffs and "provided equal rear pressure to get him to sit back down on the table." Dkt. No. 105 at 48.

Contreraz describes the physical contact differently: he says that while he was listening to the other officers, Bain yanked him backwards by the handcuffs, causing him to fall back on the picnic table, his feet leaving the ground and hitting his back, neck, and head on the table. Dkt. No. 107 ¶¶ 25-27. Contreraz alleges the officers made demeaning comments about him before, during, and after the stop. *Id.* ¶¶ 22, 32.

The officers ultimately released Contreraz from the handcuffs. *Id.* at 4; Dkt. No. 104 at 6. Upset by the interaction, Contreraz asked to speak with a supervisor. *Id.* Sergeant Kevin Jepson arrived at Wright Park to speak with Contreraz. Dkt. No. 87. Contreraz used his cell phone to live stream and record his interaction with Sgt. Jepson complaining about the officers' conduct and his conversation with two witnesses to the incident. *Id.*; Dkt. No. 105 at 31-35.

On April 24, 2021, Contreraz submitted a Public Records Act (PRA) request to the City for TPD records:

> [A]ll Tacoma Police Department records, including Internal Affair records, regarding an incident which occurred on July 12, 2020 at or around Wright Park. The incident involved an alleged complaint about a white man with a gun and a black man with a knife allegedly menacing or threatening an individual. Multiple police officers responded, including but not limited to Officer Christopher Bain. An individual, Zimmeri Contreraz was detained and handcuffed. Officer Bain used force to drive Mr. Contreraz into a picnic tabletop without notice and while Contreraz was sitting in handcuffs.

Dkt. No. 93 at 32.

On May 10, 2021, the City responded to Contreraz, stating that TPD "ha[d] no responsive records related to this request." *Id.* at 40. The City suggested that Contreraz "might check with South Sound 911 to see if they have any responsive

records." *Id.* Two days later, on May 12, 2021, Contreraz filed a PRA request with South Sound 911 for "CAD [Computer Assisted Dispatch] Log for an incident in Wright Park in Tacoma on July 12, 2020." *Id.* at 50.

Eventually, the City provided Contreraz records in response to his PRA request in three installments. First, on March 16, 2022, the Tacoma City Attorney sent Contreraz an Internal Affairs record dated October 9, 2020. Dkt. No. 93 at 15-17. The City stated provided Contreraz the document as a "courtesy." *Id.* The Internal Affairs record states "2019401679 was a CAD from July 12 occurring at Wright Parks [sic] but no mention of Contreraz." *Id.* at 17.

Second, on May 17, 2022, the City produced two CAD printouts for incident numbers 2019401679 and 2019401738 with its Rule 26 initial disclosures in this matter. Dkt. No. 100 at 13-29. No one disputes that incident number 2019401679 involved the report of armed intimidation at Wright Park that gave rise to TPD stopping Contreraz. Dkt. No. 99 at 5.

Finally, on February 21, 2023, the City discovered Field Information Reports (FIR) drafted by TPD officers Levitt and Bain, but it did not produce the FIRs to Contreraz until November 14, 2023. Dkt. No. 89. In their FIRs, Bain and Levitt describe their detention of Contreraz in Wright Park on July 12, 2020. Dkt. No. 105 at 47-52.

### 3.  ANALYSIS

Contreraz brings claims against Bain for using excessive force and battery, and he sues the City for negligence and violating Washington's Law Against Discrimination (WLAD). He also sued the City under Washington's Public Records

**ORDER** - 4

Act (PRA).[1] Defendants move to dismiss these claims, while Contreraz moves for summary judgment on his PRA claim.

### 3.1    Legal standard.

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (internal citation omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "in the light most favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (internal citation omitted). "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Summary judgment should also be granted where there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### 3.2    The Court denies the City's objections and Motion to Strike.

At the outset, the Court addresses the City's motion to strike the declarations of Sue Peters and Seth Smith. Dkt. No. 114. Contreraz retained Peters as a police

---

[1] Contreraz also sued South Sound 911 under the PRA, but it has since been dismissed from this lawsuit.

1   practices expert. The City argues Peter's declaration is "replete with inadmissible

2   hearsay," Dkt. No. 114 at 1-2, but it is well settled that experts may base an opinion

3   on inadmissible evidence, including hearsay, if it is of a kind reasonably relied upon

4   by experts in their field. *United States v. Shih*, 73 F.4th 1077, 1098 (9th Cir. 2023);

5   *see Channel Constr., Inc. v. Northland Servs., Inc.,* No. C14-1231-JCC, 2015 WL

6   13616729, at *2 (W.D. Wash. Dec. 1, 2015) (holding that expert marine electrician

7   properly relied on eyewitness statements).

8         Smith was an eyewitness to Contreraz's encounter with TPD. The City

9   argues Smith's declaration should be stricken as a discovery sanction because

10  Contreraz did not produce it sooner, and because the declaration "appears

11  inconsistent with the video interview Smith [did] with the defendant investigator

12  later . . ." Dkt. No. 114 at 2. At oral argument, the City admitted that Smith had

13  been timely disclosed as a witness, and Contreraz argued that any failure to

14  disclose Smith's declaration sooner was inadvertent and harmless. The City limits

15  its arguments, however, to the declaration and does not otherwise challenge

16  whether Smith's testimony could be presented in admissible form at trial. *Fraser v.*

17  *Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) ("Because the diary's contents could be

18  presented in an admissible form at trial, we may consider the diary's contents in the

19  Bank's summary judgment motion.").

20        Accordingly, the City's motion to strike is DENIED. In denying the motion,

21  the Court makes no ruling on the ultimate admissibility at trial of Peter's and

22  Smith's testimony.

23

**ORDER** - 6

**3.3     The Court cannot decide the issue of qualified immunity on summary judgment.**

Contreraz argues Bain used unconstitutional excessive force when he violently slammed Contreraz's head down onto a picnic table without provocation. Dkt. Nos. 1-2 at 5; 104 at 2. Defendants argue Bain is entitled to qualified immunity against Contreraz's 42 U.S.C. § 1983 excessive force claim. Dkt. No. 83 at 16. "Qualified immunity shields government officials from civil liability unless a plaintiff establishes that: (1) the official violated a constitutional right; and (2) that right was 'clearly established' at the time of the challenged conduct, such that 'every reasonable official' would have understood that what he is doing violates that right." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011)). Courts may consider the two prongs of qualified immunity "in whichever order would expedite resolution of the case." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236-239 (2009)). "[O]nly the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved." *Id.* at 823 (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)).

**3.3.1     Whether Bain's conduct was reasonable is a question for the jury.**

Whether a police officer's use of force violated the Fourth Amendment depends on the resolution of two issues: (1) in using force, did the official "seize" the suspect within the meaning of the Fourth Amendment? If so, (2) was the force objectively unreasonable? *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). There is

no dispute that TPD "seized" Contreraz,[2] so the Court considers whether the use of force was reasonable. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

To assess objective reasonableness, courts consider (1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted; (2) the government's interest in the use of force; and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc). The reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene—not with the "20/20 vision of hindsight." G*raham*, 490 U.S. at 396. This is a fact intensive inquiry, and the Ninth Circuit has cautioned that "summary judgment should be granted sparingly in excessive force cases." *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)).

The parties offer diametrically opposed views of the July 12, 2020, incident. The City argues "the tactics and force used by Officer Bain were objectively

---

[2] The City argues that Contreraz's "detention" was reasonable. Dkt. No. 83 at 13. But Contreraz characterizes the stop as "a de facto arrest" without probable cause. Dkt. No. 104 at 20. Contreraz's complaint, however, does not allege a cause of action for unreasonable seizure or unlawful arrest. The Court will not comment on the viability of such a claim, but Contreraz must amend his complaint if he wishes to pursue it. *See Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

reasonable" because Contreraz "refused to identify himself," became "increasingly agitated," and "suddenly started to move towards the officers which . . . is considered a possible pre-attack indicator." Dkt. No. 83 at 9-10. Contreraz argues that he was cooperative and compliant, and that Bain nonetheless yanked him backwards by his handcuffs. *See* Dkt. No. 104. Contreraz alleges that Bain used such force that he fell back, with his feet leaving the ground and touching the officer in front of him. *Id.* at 5-6. Contreraz's back, neck, and head hit the picnic table, and he could not stand on his own, so the other officers had to assist him up. *Id.* Smith confirms Contreraz's account. Dkt. No. 105 at 33-34, 40. As a result, Contreraz alleges he suffered head and neck injuries, including a concussion, as well as PTSD and continuing mental and emotional distress. Dkt. No. 104 at 21-22.

Viewing the evidence in the light most favorable to Contreraz, the *Lowry* factors show that a reasonable jury could find that Bain's conduct violated Contreraz's Fourth Amendment rights given the aggressive and unwarranted use of force resulting in serious injury. *See Rice v. Morehouse,* 989 F.3d 1112, 1121 (9th Cir. 2021) (use of "take-down" maneuver causing suspect to trip and fall face first on pavement involved a "substantial" and "aggressive use" of force). The truth, however, boils down to witness credibility. The City concedes as much by devoting pages of its brief attacking Contreraz's trustworthiness using only the officers' word as ammunition. Dkt. No. 83 at 10 ("Plaintiff is simply not a credible source regarding this incident.").

Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

judge," the Court cannot resolve this claim on summary judgment. *Anderson*, 477 U.S. at 255. The jury, not this Court, will have to decide whom to believe.

### 3.3.2   Ninth Circuit precedent clearly establishes that an officer using non-trivial force where a suspect either did not resist or only passively resisted is unconstitutional.

Next, the Court considers whether Contreraz's right to be free from Bain's conduct was clearly established. *Pearson*, 555 U.S. at 231. "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Rice,* 989 F.3d at 1125 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To determine whether an officer violated a clearly established law, Courts survey the judicial landscape looking for analogous, although not necessarily identical, cases. *Id.*

Assuming the facts above for purposes of the second part of the qualified immunity test, there was clearly established precedent that would have made it clear enough to reasonable police officers that the acts here constituted excessive force. The circumstances here are not too different from those in *Rice*. There, a police officer stopped Rice because she suspected he was driving under the influence. Officers instructed Rice to get out of his car, but he refused. *Id.* at 1117. The officers pulled him from the car. The police attempted to hold Rice in a lead position. *Id.* Rice alleged that he did not resist the officers, but nonetheless, as they approached the rear of his car, the officers tripped him and forcibly threw him to the ground using a "take-down" maneuver. *Id.* Rice landed face-first on the pavement and suffered extreme pain. *Id.* The Ninth Circuit recognized a body of

relevant case law that placed the use of substantial force against a passively resisting person "beyond debate," and observed a "clearly established . . . right to be free from any kind of non-trivial force where the plaintiff either did not resist or only passively resisted the officer." *Id.* at 1126.

Contreraz alleges Bain performed a type of reverse take-down, causing him to fall backwards head-first onto a picnic table even though he was cooperative and compliant with the officers' directives. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("[F]orce is only justified when there is a need for force."). Drawing all reasonable inferences in Contreraz's favor, this was a "substantial" and "aggressive" use of force against a non-resisting suspect that violated a clearly established right. Of course, a jury could credit Bain's and the other officer's testimony and find that the force used wasn't excessive or that it was otherwise justified. But because Contreraz has shown that a genuine dispute of material fact exists about the reasonableness of Bain's conduct, and because under one version of the facts, Bain's conduct violated clearly established law, Defendants are not entitled to summary judgment based on qualified immunity on the excessive force claim.

### 3.4   Questions of fact preclude summary judgment of Contreraz's WLAD claim.

Next, Defendants move to dismiss Contreraz's WLAD claims, arguing Contreraz "cannot adduce any competent and credible evidence to show that the officers' conduct was motivated by his race or consciously motivated to prevent him from full use of the park because of his race." Dkt. No. 83 at 19. The record before

1   the Court, however, shows that there are questions of material fact that preclude

2   summary judgment on this claim.

3       The WLAD secures the right to "full enjoyment" of any place of public

4   accommodation. RCW 49.60.030(1)(b). "The WLAD's broad definition of 'full

5   enjoyment' extends beyond denial of service to include liability for mistreatment

6   that makes a person feel not welcome, accepted, desired, or solicited." *Floeting v.*

7   *Grp. Health Coop.*, 434 P.3d 39, 42 (Wash. 2019) (internal quotation marks omitted)

8   (citing RCW 49.60.040(14)). The WLAD prohibits "any person or the person's agent

9   or employee [from committing] an act which directly or indirectly results in any

10  distinction, restriction, or discrimination" based on a person's membership in a

11  protected class. RCW 49.60.215.

12      To establish a claim of public accommodation discrimination under the

13  WLAD, Contreraz must prove that (1) he is a member of a protected class, (2) the

14  defendant's establishment is a place of public accommodation, (3) the defendant

15  discriminated against him when it did not treat him in a manner comparable to the

16  treatment it provides to persons outside that class, and (4) his protected status was

17  a substantial factor that caused the discrimination. *Floeting*, 434 P.3d at 41 (citing

18  *Fell v. Spokane Transit Auth.*, 911 P.2d 1319, 1328 (Wash. 1996)). "To be actionable,

19  the asserted discriminatory conduct must be objectively discriminatory," meaning

20  that "a reasonable person who is a member of the plaintiff's protected class, under

21  the same circumstances, would feel discriminated against." *Id.* at 44.

22      The first two elements of Contreraz's WLAD claim are easily satisfied—the

23  incident at-issue took place in Wright Park—a place of public accommodation—and

Contreraz is Black. *Fell*, 911 P.2d 1329 n.24 (parks constitute a place of public accommodation) (citing *Davis v. Tacoma Ry. & Power Co.*, 77 P. 209 (Wash. 1904)). As to the later elements, Defendants argue that they did not stop Contreraz because he is Black, but because he "reasonably" fit the description of an armed suspect. *See* Dkt. No. 83 at 3, 19-20. The emergency call, however, conveyed that there were two armed suspects in the park that day—one white, one Black—but TPD only stopped Contreraz. This is true even though Smith "reasonably" fit the description of the white suspect, *see* Dkt No. 105 at 25, and was near Contreraz at the time he was stopped. Dkt. No. 106 ¶ 19. Smith states that he "wasn't questioned" at all. Dkt. No. 108 ¶ 8. That Contreraz was stopped, while Smith wasn't, is probative of discriminatory intent, as information about comparators who are treated more favorably is often powerful evidence in discrimination cases. *See Fell,* 911 P.2d at 1327-30 (considering comparability of treatment in public accommodation discrimination case); *Negron v. Snoqualmie Valley Hosp.*, 936 P.2d 55, 59 (Wash. Ct. App. 1997) ("[A] trier of fact could conclude that [the defendant] did not treat the [plaintiffs] comparably to non-disabled persons" in public accommodation discrimination case).

Viewing the evidence in the light most favorable to Contreraz, Defendants have not shown that they are entitled to summary judgment on his WLAD claim. In the end, "[t]he presence of discrimination is ultimately a factual issue" for the jury. *Lewis v. Doll*, 765 P.2d 1341, 1343 (Wash. Ct. App. 1989) (citation omitted).

1

2

**3.5    Questions of fact preclude summary judgment on Contreraz's negligence claim against Tacoma.**

3

4

Contreraz alleges the City acted negligently by failing to use "reasonable care

5

with regard to [his] detention." Dkt. No. 1-2 at 6-7. "Under Washington law, a local

6

government is liable in tort 'to the same extent as if [it] were a private person or

7

corporation.'" *Dold v. Snohomish Cnty.*, 649 F. Supp. 3d 1084, 1110 (W.D. Wash.

8

2022) (quoting RCW 4.96.010(1)). "Washington courts have long recognized the

9

potential for tort liability based on the negligent performance of law enforcement

10

activities." *Beltran-Serrano v. City of Tacoma*, 442 P.3d 608, 611 (Wash. 2019)

11

(citations omitted). To sustain an actionable negligence claim, the classic formula

12

applies: plaintiffs must prove duty, breach, proximate cause, and resulting harm.

13

*Pedroza v. Bryant*, 677 P.2d 166, 168 (Wash. 1984).

Contreraz makes overtures towards claims of negligent training, supervision,

14

and retention in his opposition brief, but he does not plead any specific theories of

15

negligence in his complaint. Instead, Contreraz argues that the facts establishing

16

his Section 1983 claims are essentially the same ones that prove his negligence

17

claim. The City argues that Contreraz cannot maintain both a claim for negligence

18

and a claim premised on the intentional use of excessive force, but the Washington

19

Supreme Court has already answered this question in Contreraz's favor, holding in

20

*Beltran-Serrano* that plaintiffs may maintain both causes of action. 442 P.3d at 611.

21

In *Beltran-Serrano,* a simple social contact between TPD and the plaintiff

22

escalated to the use of deadly force when TPD officers shot the plaintiff several

23

times. *Id.* at 609-611. The plaintiff survived and sued the City of Tacoma for

negligence and assault and battery. *Id.* The trial court dismissed the negligence claims on summary judgment, finding that the only avenue for any recovery must be an intentional tort for assault and battery. *Id.* at 609. The Washington Supreme Court reversed, holding the mere fact that the officer's conduct may constitute an intentional tort does not preclude a negligence claim premised on the officer's alleged failure to use reasonable care. *Id.* at 611-614.

Contreraz alleges that TPD breached its duty to use reasonable care to avoid escalating its encounter with him to the use of aggressive and substantial force by failing to follow "clearly established law with regard to investigative stops and reasonable suspicion; *de facto* arrests and the necessary probable cause; and, the acceptable use of force when an individual is compliant and cooperative during an investigation." Dkt. No. 104 at 28. The "core" of Contreraz's negligence claim thus "require[s] consideration of the totality of the circumstances involved in the encounter," and to "identify potential negligence in the series of actions leading up to" the use of force. 442 P.3d at 611-12. In this way, his negligence claim aligns with the court's holding in *Beltran-Serrano.*

Further—as considered in *Beltran-Serrano*—state and federal law permit Contreraz to pursue alternative, and even inconsistent, case theories. *See* 442 P.3d at 612 ("[T]he practice in Washington . . . allow[s] claims to be pursued under alternative, even inconsistent, theories of recovery."); *and* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims … as it has, regardless of consistency."). So, the fact that Contreraz alleges that Bain acted intentionally in the alleged use of excessive force and that the City was negligent is of no consequence.

Although their motion is silent on the subject, Defendants claimed for the first time at oral argument that they owed Contreraz no specific duty under the public duty doctrine. "The public duty doctrine comes into play when special governmental obligations are imposed by statute or ordinance," such as "the [C]ity's statutorily imposed obligation to provide police services, enforce the law, and keep the peace." *Beltran-Serrano,* 442 P.3d at 614-15. Under the public duty doctrine, save for a few exceptions that are not relevant here, an individual cannot establish a claim against the government unless the government breached a duty owed to the individual rather than "a general obligation owed to the public." *Id.* But at common law, every individual—including law enforcement personnel—owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others. *Id.* at 614. Because Contreraz's negligence claim arises from Bain's and the other TPD officers' "direct" and "affirmative interaction[s]" with Contreraz, and not some generalized public duty, the public duty doctrine does not apply. *Id.*

Because there are material questions of fact about Bain's conduct and whether the City acted negligently, summary judgment on Contreraz's negligence claim must be denied.

## 3.6 Questions of fact preclude summary judgment on Contreraz's battery claim against the City.

In a footnote, the City argues that Contreraz's battery claim should be denied because Contreraz's "state law assault and battery claim rise[] and falls with his Fourth Amendment excessive force claim." Dkt. No. 83 at 13 n.8. While the claims overlap, Contreraz is allowed to plead in the alternative. *See* Fed. R. Civ. P. 8(d)(3).

As explained above, there numerous disputes of material fact about Bain's use of force. *See Reagan v. Newton*, 436 P.3d 411, 421 (Wash. Ct. App. 2019) ("A person is liable for battery if he or she intends to cause a harmful or offensive contact and such a contact directly or indirectly results."). Accordingly, Defendants' summary judgment motion on Contreraz's battery claim must be denied.

### 3.7   Contreraz's PRA claims.

Finally, the Court considers the parties' cross motions for summary judgment on Contreraz's PRA claims. Contreraz alleges the City conducted an inadequate search for records responsive to his April 24 and May 12, 2021, PRA requests, including two CAD logs, an Internal Affairs record dated October 9, 2020, and separate FIRs drafted by officer Levitt and Bain about the incident in Wright Park on July 12, 2020. *See* Dkt. No. 92. The City denies this charge and contends that it conducted an adequate search and that any documents withheld were non-responsive or irrelevant. *See* Dkt. No. 110.

As a starting point, the PRA requires governmental agencies to "make available for public inspection and copying all public records, unless the record falls within the specific exemptions." RCW 42.56.070(1). The PRA provides a cause of action when an agency wrongfully denies a request. *Andrews v. Washington State Patrol*, 334 P.3d 94, 97 (Wash. Ct. App. 2014) (citing RCW 42.56.550(1), (2)).

In responding to requests under the PRA, agencies must conduct an "adequate search" for records. *Neighborhood All. of Spokane Cnty. v. Spokane Cnty.*, 261 P.3d 119, 128 (Wash. 2011). "[A]n inadequate search is comparable to a denial

because the result is the same, and should be treated similarly in penalty determinations, at least insofar as the requester may be entitled to costs and reasonable attorney fees under" the PRA. *Id.* Adequacy under the PRA is a question of reasonableness—"the search must be reasonably calculated to uncover all relevant documents." *Id.* This test should take into account the PRA's policy that the "free and open examination of public records is in the public interest, even if examination may cause inconvenience or embarrassment." *Id.* at 125 (citing RCW 42.56.550(3)). "What will be considered reasonable will depend on the facts of each case." *Id.* at 128. Agencies are not required to search *"every* possible place a record may conceivably be stored," but they must search every place where records are *"reasonably likely* to be found." *Id.* (emphasis in original).

On a summary judgment motion in a PRA case, the agency "bears the burden, beyond material doubt, of showing its search was adequate." *Id.* at 128. "To do so, the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith. These should include the search terms and the type of search performed, and they should establish that all places likely to contain responsive materials were searched." *Id.*

As a starting point, the Court denies Contreraz's request for damages stemming from his May 12, 2021, PRA request because it was directed to South Sound 911, not the City. *See* Dkt. Nos. 92 at 5-6; 93 at 50. The Court turns to Contreraz's April 24, 2021, request submitted to the City.

**ORDER** - 18

1

2

### 3.7.1      The City conducted an inadequate search for CAD logs held by South Sound 911.

On April 24, 2021, Contreraz submitted a PRA request for all TPD records related to an incident that occurred on July 12, 2020. Responsive to this request were CAD logs for incident numbers 2019401679 (involving suspects reported to be intimidating a victim with weapons) and 2019401738 (involving a missing child). The CAD logs captured incident response information and communications in the field. *See* Dkt. No. 93 at 7, 9; *see also* Dkt. No. 89 ¶ 10. TPD argues the CAD logs are not relevant, but each log references incidents at Wright Park on July 12, 2020, and they thus plainly respond to Contreraz's request. *See* Dkt. No. 99 at 6; *see also Resident Action Council v. Seattle Hous. Auth.,* 327 P.3d 600, 607 (Wash. 2013) ("insofar as certain public records are responsive . . . [i]f no exemption applies generally to the relevant types of records or information, the requested public records must be disclosed.").

Alternatively, the City argues that "Sound 911 is the records custodian, not the City of Tacoma," and that the City therefore had no duty to produce the documents. Dkt. No. 83 at 22. But the PRA should not be read so narrowly that it can be avoided simply by storing agency records outside the agency. *Nissen v. Pierce Cnty.*, 357 P.3d 45, 53-55 (Wash. 2015) (records "used" by an agency employee must be gathered and disclosed if they are responsive to a public records request, even if the device storing the record is not owned by the agency). In *Nissen,* the Washington Supreme Court observed that, by definition, a public record is one "that it is 'prepared, owned, used, or retained by any state or local agency.'" *Id.* at 52

**ORDER** - 19

(quoting RCW 42.56.010(3)). Thus, "a record that an agency employee prepares, owns, uses, or retains in the scope of employment is necessarily a record 'prepared, owned, used, or retained by [a] state or local agency.'" *Id.* at 52-53 (quoting RCW 42.56.010(3)).

In parsing this language, the *Nissen* court held that "prepared" means "to put together[,] make, produce . . . to put into written form." *Id.* at 55 (cleaned up) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1790 (2002)). And "[t]o 'own' a record means 'to have or hold [it] as property.'" *Id.* (citing WEBSTER'S at 1612). To "'retain' a record means 'to hold or continue to hold [it] in possession or use.'" *Id.* The term "used" is broadly defined and hinges on some "nexus" between the requested information and the agency's decision-making process. *Id.* Thus, "[a] record that is prepared and held by a third party, without more, is not a public record. But if an agency 'evaluat[es], review[s], or refer[s]' to a record in the course of its business, the agency 'uses' the record within the meaning of the PRA." *Id.* (quoting *Concerned Ratepayers Ass'n v. Pub. Util. Dist. No. 1 of Clark County*, 983 P.2d 635 (Wash. 1999)).

While not explicitly stated, Tacoma's argument that it had no duty to look for records in South Sound 911's possession rests on its contention that it did not "prepare," "own," or "retain" the CAD logs in question. *See* Dkt. No. 110 at 7. But the record before the Court shows that it certainly "used" them. The CAD is created by South Sound 911 dispatchers and is a summary of the radio communications between officers and the communications center. Dkt. No. 85 ¶ 5. According to TPD's Administrative Support Specialist, TPD does not "hold" information,

including incident reports or CAD reports, and relies on South Sound 911 to store the information instead. Dkt. No. 90 ¶¶ 6,7. TPD, however, can "interface and input data into South Sound 911's" system. Dkt. No. 102 ¶ 3. Thus, "its [sic] possible [for TPD] to determine whether incident reports exist which are in the South Sound 911 system." No. 90 ¶¶ 6,7. Further, "[TPD is] able to search the [South Sound 911] system using the Global Name Inquiry Tab to locate incident numbers or CAD number in the system." *Id.*; *see also* Dkt. No. 93 at 73. TPD officers can input data related to CADs, and as discussed below, did in fact input information into the CAD log about incident number 2019401679 regarding armed suspects at Wright Park on July 12, 2020. Dkt. No. 102 ¶ 4. TPD officers rely on CAD records, among other things, to refresh their memories about various incidents. *See* Dkt. No. 85 ¶ 5. TPD's Internal Affairs officers also access, download, and incorporate CAD data into their criminal investigation files or Internal Affairs' separate case management system. Dkt. No. 89 ¶ 10. TPD's Internal Affairs reviewed the CAD log for incident number 2019401679 in evaluating Contreraz's allegations of excessive force. Dkt. No. 93 at 17.

Accordingly, the Court finds that TPD used the CAD logs stored in South Sound 911's system because they clearly play a role in TPD's business as records themselves. *Nissen,* 357 P.3d at 55. In *Banks v. City of Tacoma,* an unpublished opinion, the Washington Court of Appeals presaged this conclusion, writing, "[t]he [City of Tacoma's] position that it can simply refer [PRA] requesters to South Sound 911 was risky given that the City used South Sound 911's database on a daily basis." No. 52072-9-II, 2021 WL 2229038, at *13 n.10 (Wash. Ct. App. June 2, 2021).

The City had an obligation to produce the CAD logs in response to Contreraz's PRA request, so it follows that the City violated the PRA when it failed to provide Contreraz CAD logs Nos. 2019401679 and 2019401738.

### 3.7.2    Levitt's and Bain's FIRs based on their observations in Wright Park on July 12, 2020.

Contreraz also alleges that the City violated the PRA by failing to produce FIRs—a type of written report narrating a police encounter—drafted by officers Levitt and Bain about the July 12, 2020, incident in Wright Park, which they drafted that same day. Dkt. No. 93 at 19-24. The City first discovered these reports in February 2023, but did not produce them until November 14, 2023. Dkt. Nos. 89 ¶17. The City claims that it did not discover the reports sooner because they existed as "linkless data in South Sound's system." *Id.*; Dkt. 99 at 23. Ultimately, Lt. Gary J. Roberts, who oversees TPD's Internal Affairs section, "discovered" the reports. Dkt. Nos. 89; 99 at 24.

Like the CAD logs, the City argues that it was not required to produce these records because South Sound 911 was the "custodian" and because the reports are irrelevant. Dkt. No. 83 at 22. The City also argues that its search was "adequate," and therefore, its undeniably late disclosure of the reports did not violate the PRA. Dkt. No. 83 at 20-22.

The Court concludes the FIRs are plainly relevant and responsive to Contreraz's PRA request. These are reports from the TPD officers that stopped Contreraz and their narrative description of the events giving rise to this lawsuit. *See* Dkt. No. 93 at 20-24. It is hard to imagine how these reports could be any *more*

relevant. Next, the Court rejects the City's arguments that it was not required to produce Levitt and Bain's reports because South Sound 911 was the purported "custodian." Bain and Levitt "prepared" the FIRs, which makes them public records no matter where they are stored. *See Nissen*, 357 P.3d at 55.

Still, the City argues it should not be penalized because it performed an "adequate" search. To be sure, an agencies' search need not be perfect to be adequate, and the fact that a requesting party later obtains responsive documents from the agency or some other source does not by itself establish an inadequate search. *Block v. City of Gold Bar*, 355 P.3d 266, 273 (Wash. Ct. App. 2015). But an adequate search is "reasonably calculated to uncover all relevant documents." *Neighborhood All.*, 261 P.3d at 128. The search must be "more than [] perfunctory" and must "follow obvious leads." *Id.* Under controlling law, "the focus of the inquiry is not whether responsive documents do in fact exist, but whether the search itself was adequate." *Id.*

The Court has thoroughly reviewed the steps taken by the City to identify records in response to Contreraz's PRA requests and finds the City's search inadequate. The City's failure to search South Sound 911's records is unforgivable given that TPD uses and prepares the records stored in its system. The City's recitals of Lt. Robert's efforts to find additional documents cuts against its position. The relevant fact is that the City's employee Bollinger apparently discovered the FIRs months before Lt. Roberts. The City has failed to explain how Bollinger came across the documents, why it did not search for information responsive to Contreraz's PRA claim in South Sound 911's system, even if it was "linkless," and

why it took the City until February 2023 to search a database that would reasonably be expected to have responsive information before denying Contreraz's request. *See* Dkt. No. 110 at 26.

Moreover, the City apparently did not follow its own search protocols, which acknowledge "[t]he employees in the individual departments know best what documents exist and where they are located." Dkt. No. 101 ¶ 5. And that once a request is received, each "department's public disclosure coordinators will review the request[] to identify the people in their department that may have responsive records . . . ." *Id.* ¶ 6. Here, the City did not think to look specifically for reports completed by the officers responding to the July 12, 2020, incident, or to inquire with them directly if they had prepared any written records. *See Microsoft Corp. v. Internal Revenue Serv.*, No. C15-1605 RSM, 2023 WL 255831, at *2-3 (W.D. Wash. Jan. 18, 2023) (finding adequate search in FOIA context when agency, among other things, asked all relevant custodians to search for potentially responsive records in their possession). This is true even when Contreraz's PRA request specifically identified "Christopher Bain" as a proposed search term. Dkt. No. 93 at 32, 35. These were "obvious leads" for responsive records that should have been followed.

Accordingly, the Court finds that the City violated the PRA when it failed to produce Bain's and Levitt's written reports.

### 3.7.3    Internal Affairs record dated October 9, 2020.

Contreraz also claims the City violated the PRA by failing to produce IA Phone Logs created in October 2020. Dkt. No. 92 at 6. Contreraz requested all TPD

records, "including Internal Affair[s] records," regarding the July 12, 2020, incident at Wright Park, but he specified the date range for his records request as July 12 to July 13, 2020. Dkt. No. 93 at 32, 35. The City argues that it did not have to produce records outside the requested date range. The Court agrees.

The PRA requires agencies to produce "identifiable records." RCW 42.56.080(2). It makes sense, then, that persons seeking documents under the PRA must identify the documents sought with sufficient clarity to allow the agency to conduct an adequate search. *Wood v. Lowe*, 10 P.3d 494, 497-98 (Wash. Ct. App. 2000). "An identifiable public record is one in which the requester has given 'a reasonable description enabling the government employee to locate the requested records.'" *Id.* at 498 (quoting *Bonamy v. City of Seattle*, 960 P.2d 447 (Wash. Ct. App. 1998)).

Contreraz made a clear and unambiguous request for all TPD records regarding the July 12, 2020, dated July 12 to July 13, 2020. TPD properly interpreted this record request as limited by the date range requested. Contreraz may have intended to request a broader range, but the City need not be a "mind reader[]" and to interpret his request more broadly than what he has stated. *Bonamy,* 960 P.2d at 451. Similar, an "agency cannot be expected to disclose records that have not yet been requested. To hold otherwise would place public agencies in an untenable position." *Id.*

Because the Internal Affairs phone log fell outside the date range of the records Contreraz requested, the City did not violate the PRA with respect to those records.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**3.8     PRA penalty and costs and fees.**

Given the City's inadequate search for records, the Court concludes that Contreraz is the prevailing party and now turns to the question of penalties. *Gronguist v. Washington State Dep't of Licensing*, 309 P.3d 538, 545 (Wash. Ct. App. 2013) ("A PRA claimant 'prevails' against an agency if the agency wrongfully withheld the documents.") (citation omitted).

Under the PRA, "[a]ny person who prevails against an agency in any action in the courts seeking the right to inspect . . . any public record . . . shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action." RCW 42.56.550(4). "Where the PRA is violated, trial courts *must* award penalties at not less than $5 per day but not more than $100 per day." *Yousoufian v. Off. of Ron Sims*, 229 P.3d 735, 747 (Wash. 2010) (emphasis original) (cleaned up). The penalty discourages improper denial of access to public records and encourages future compliance. *Id.* at 745.

"Trial courts may exercise their considerable discretion under the PRA's penalty provisions in deciding where to begin a penalty determination." *Id.* at 747. In *Yousoufian,* the Washington Supreme Court set forth guidelines for exercising this discretion in a nonexclusive list of mitigating and aggravating factors. *Id.* at 747-48. Mitigating factors that may *decrease* the penalty include:

> (1) a lack of clarity in the PRA request, (2) the agency's prompt response or legitimate follow-up inquiry for clarification, (3) the agency's good faith, honest, timely, and strict compliance with all PRA procedural requirements and exceptions, (4) proper training and supervision of the agency's personnel, (5) the reasonableness of any explanation for noncompliance by the agency, (6) the helpfulness of the agency to the

requestor, and (7) the existence of agency systems to track and retrieve public records.

*Id.* at 747. On the other hand, aggravating factors that may *increase* a penalty are:

> (1) a delayed response by the agency, especially in circumstances making time of the essence, (2) lack of strict compliance by the agency with all the PRA procedural requirements and exceptions, (3) lack of proper training and supervision of the agency's personnel, (4) unreasonableness of any explanation for noncompliance by the agency, (5) negligent, reckless, wanton, bad faith, or intentional noncompliance with the PRA by the agency, (6) agency dishonesty, (7) the public importance of the issue to which the request is related, where the importance was foreseeable to the agency, (8) any actual personal economic loss to the requestor resulting from the agency's misconduct, where the loss was foreseeable to the agency, and (9) a penalty amount necessary to deter future misconduct by the agency considering the size of the agency and the facts of the case.

*Id.* at 748. "[T]he failure to perform an adequate search is at least an aggravating factor, to be considered in setting the daily-penalty amount." *Neighborhood All.*, 261 P.3d at 130.

The principal factor to consider is the existence or absence of an agency's bad faith, but a showing of bad faith is not needed to impose a penalty. *Yousoufian*, 229 P.3d at 744. And neither an agency's good faith reliance on an exemption nor the production of a wrongfully withheld document after the fact will save an agency from a penalty. *See Neighborhood All.*, 261 P.3d at 131-32; *Yousoufian*, 229 P.3d at 744. "'[N]o one factor should control.'" *Hoffman v. Kittitas Cnty.*, 449 P.3d 277, 281 (Wash. 2019) (quoting *Yousoufian*, 229 P.3d at 748).

1

2

### 3.8.1   On balance, aggravating factors justify a penalty against the City.

3

4

The City failed to produce multiple, relevant documents as a result of its

5

inadequate search for responsive records. The City responded to Contreraz a little

6

more than a week after he submitted his PRA request, stating that it had no

7

responsive documents. Dkt. No. 93 at 40. But in its haste, the City did not check one

8

of the most obvious places likely to contain responsive materials—South Sound

9

911's database. Had TPD searched South Sound 911's system, it would have

10

discovered the CAD logs detailing communications between dispatch and officers

11

responding to the incident at Wright Park on July 12, 2020, as well as the FIRs

12

drafted by Bain and Levitt, two of the officers who responded to the emergency call.

13

The City's position is that it had no duty to search South Sound 911's system

14

because South Sound 911 is the "custodian" of the CAD logs and incident reports,

15

but as this Court has held, this explanation is not reasonable because TPD accesses,

16

inputs data, and otherwise uses South Sound 911's system to conduct its business.

17

The City also argues that even if it had searched South Sound 911's system,

18

it would not have discovered the "linkless" data, but the City's sworn declarations

19

are conclusory on this point, and internally inconsistent given the linkless data was

20

discovered simply by contacting IT staff. Moreover, the City's reference to "linkless"

21

data unfairly sanitizes the record, as the "data" include the FIRs drafted by the

22

officers who detained Contreraz—they could not be any more relevant in the context

23

of Contreraz's PRA requests or lawsuit. Even setting aside the alleged computer

**ORDER** - 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

issues, a reasonable search would have included contacting the officers involved in Contreraz's stop about any written records the authored or retained.

Put plainly, many aggravating factors are present. There is no clear evidence, however, that the City acted in bad faith or dishonestly, which is perhaps the biggest mitigating factor in the City's favor. Looking at the situation holistically—the City's inadequate search, the City's willfully ignorant approach to South Sound 911's system, and the important documents withheld—it is clear a penalty is warranted to deter further denials of access to public records and to spur reform, especially with respect to the City's search for public records housed by South Sound 911.

### 3.8.2    Penalty period.

Under RCW 42.56.520(1), the City had to respond to Contreraz's public records request "within five business days of receiving" it. *C.f. West v. Thurston Cnty.*, 275 P.3d 1200, 1216 (Wash. Ct. App. 2012) ("the superior court correctly calculated the number of days that the County had improperly denied [plaintiff's] access to public records to which he was entitled" when it calculated days from the date of the plaintiff's request). The PRA provides "it shall be within the discretion of the court to award . . . an amount . . . *for each day that he or she was denied the right to inspect or copy said public record*." RCW 42.56.550(4) (emphasis added).

As noted earlier, Contreraz submitted his PRA request on April 24, 2021. This means the City was required to respond to his request by April 30, 2021 (i.e., five business days later). The City produced the CAD logs to Contreraz on May 17,

2022, or 381 days after its response would have been considered late on May 1, 2021 (i.e., the day after April 30, 2021). *See* Dkt. Nos. 93 ¶ 2; Dkt. No. 99 at 15. The City did not produce Levitt's and Bain's investigative reports until November 14, 2023, or 927 days late. *Comp.* Dkt. No. 83 at 21 *with* Dkt. No. 93 ¶¶ 13, 14.

Considering all the circumstances, the Court orders the City to pay $35 per day in penalties for its failure to produce the CAD logs (381 days x $35) and Bain's and Levitt's FIRs (927 days x $35), for a total of $45,780. The City is also ordered to pay Contreraz's reasonable attorneys' fees and costs for bringing his motion.

## 4. CONCLUSION

In sum, the City's motion for summary judgment is DENIED, and Contreraz's motion for partial summary judgment is GRANTED in-part. The parties must submit additional briefing regarding reasonable attorneys' fees and costs within 14 days of entry of this Order. It is so ORDERED.

Dated this 15th day of March, 2024.

Jamal N. Whitehead
United States District Judge