1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ZIMMERI CONTRERAZ, individually,

               Plaintiff,

     vs.

CITY OF TACOMA, a municipal corporation,
SOUTH SOUND 911, an interlocal agreement
agency; and, CHRISTOPHER BAIN, in his
individual capacity

            Defendants.

Case No. 3:22-cv-05106-JNW

PLAINTIFF'S DEPOSITION
DESIGNATIONS OF THE VIDEO
TESTIMONY OF DEFENDANT
CHRISTOPHER BAIN

TRIAL DATE:  APRIL 26, 2024

Pursuant to the Court's order on April 1, 2024, the plaintiff designates the following testimony of Defendant Christopher Bain along with filing a copy of the highlighted deposition transcript with designations as originally served on the defendants on March 19, 2024.  To date, Plaintiff has received no objections or counter-designations.

**Deposition of Defendant Christopher Bain**

| Deposition Page & Line | OBJECTIONS | Court's Ruling |
|---|---|---|
| Pg. 5; l. 17 – Pg. 7, l. 1 | | |
| Pg. 7; l. 5 – Pg. 9, l. 23 | | |
| Pg. 10; l. 5 – Pg. 14. l. 1 | | |

PLAINTIFF'S DEPOSITION DESIGNATIONS OF
THE VIDEO TESTIMONY OF DEFENDANT
CHRISTOPHER BAIN



**COCHRAN
DOUGLAS**
Attorneys at Law

2501 Fawcett Avenue
Tacoma, WA 98402
www.cochrandouglas.com

| | | |
|---|---|---|
| Pg. 15, l. 12 – Pg. 16, l. 2 | | |
| Pg. 16, ll. 10-25 | | |
| Pg. 17, ll. 3-8 | | |
| Pg. 17, l. 18 - Pg. 19, l. 21 | | |
| Pg. 19, l. 24 – Pg. 20, l. 14 | | |
| Pg. 46, ll. 14 – 23 | | |
| Pg. 46, l. 25 – Pg. 55, l. 12 | | |
| Pg. 55, l. 16 – Pg. 56, l. 6 | | |
| Pg. 56, ll. 8-22 | | |
| Pg. 57, l. 7 – Pg. 58, l. 4 | | |
| Pg. 58, ll. 9 – 21 | | |
| Pg. 58, l. 24 – Pg. 60, l. 9 | | |
| Pg. 60, ll. 12 - 23 | | |
| Pg. 61, ll. 2-22 | | |
| Pg. 61, l. 25 – Pg. 62, l. 6 | | |
| Pg. 62, l. 25 – Pg. 63, l. 3 | | |
| Pg. 63, ll. 6-15 | | |
| Pg. 65, l. 17 – Pg. 69, l. 18 | | |
| Pg. 69, l. 25 – Pg. 78, l. 16 (Objection on Pg. 70) | | |

PLAINTIFF'S DEPOSITION DESIGNATIONS OF
THE VIDEO TESTIMONY OF DEFENDANT
CHRISTOPHER BAIN



COCHRAN
DOUGLAS
Attorneys at Law
2501 Fawcett Avenue
Tacoma, WA 98402
www.cochrandouglas.com

| | | |
|---|---|---|
| Pg. 78, l. 19 – Pg. 80, l. 21 | | |
| Pg. 80, l. 24 – Pg. 88, l. 2 (Objections on pgs. 81, 82, 84-87) | | |
| Pg. 88, l. 11 – Pg. 97, l. 3 (Objections on pgs. 89, 91-92, 95-97. | | |
| Pg. 107, l. 25 – Pg. 115, l. 115 (Objections on pgs. 109, 112-115) | | |
| Pg. 116, l. 11 – Pg. 132, l. 7 (Objections on pgs. 117,120-132) | | |

DATED this 3rd day of April, 2024

COCHRAN DOUGLAS, PLLC

By:    /s/ Loren A. Cochran
       Loren A. Cochran, WSBA No. 32773
       Nicholas B. "Cole" Douglas, WSBA No. 49786
       Tiffany L. Wilke, WSBA No. 49874
       *Attorneys for Plaintiff*

PLAINTIFF'S DEPOSITION DESIGNATIONS OF
THE VIDEO TESTIMONY OF DEFENDANT
CHRISTOPHER BAIN



COCHRAN DOUGLAS
**Attorneys at Law**
2501 Fawcett Avenue
Tacoma, WA 98402
www.cochrandouglas.com

1

## CERTIFICATE OF SERVICE

2      I, **Kim Snyder,** hereby declare under penalty of perjury under the laws of the State

3   of Washington and the United States of America that I am employed at Cochran Douglas Law

4   and that on today's date, I served the foregoing via **ECF a**nd **email**, by directing delivery to

5   the following individuals:

6

7           Kymm Cox
            Jennifer Taylor
8           CITY OF TACOMA ATTORNEY
            747 Market Street, Room 1120
9           Tacoma, WA 98402
            jtaylor@cityoftacoma.org
10          gcastro@cityoftacoma.org
            bpittman@cityoftacoma.org
11          kcox@cityoftacoma.org

12          *Attorneys for Defendants City of Tacoma and Christopher Bain*

13

14      DATED this 3rd day of April, 2024.

15                                              /s/ Kim Snyder
                                                Kim Snyder, Legal Assistant
16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S DEPOSITION DESIGNATIONS OF
THE VIDEO TESTIMONY OF DEFENDANT
CHRISTOPHER BAIN



COCHRAN
DOUGLAS
**Attorneys at Law**
2501 Fawcett Avenue
Tacoma, WA 98402
www.cochrandouglas.com

# Deposition of Officer Christopher Bain

# Contreraz v. City of Tacoma, et al.

# November 14, 2023



206.287.9066 I 800.846.6989
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

_____

ZIMMERI CONTRERAZ, individually,    )
                                    )
            Plaintiff,              )
                                    )
    v.           No. 3:22-cv-05106-BHS
                                    )
CITY OF TACOMA, a municipal         )
corporation; SOUTH SOUND 911, an    )
Interlocal agreement agency; and    )
CHRISTOPHER BAIN, in his            )
individual capacity,                )
                                    )
            Defendants.             )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

OFFICER CHRISTOPHER BAIN

_____

Taken at 747 Market Street, Room 1120

Tacoma, Washington

DATE TAKEN:  NOVEMBER 14, 2023
REPORTED BY:  BARBARA CASTROW, RMR, CRR, CCR #2395

---

**Page 2**

```
 1                APPEARANCES
 2  FOR PLAINTIFF:
 3        LOREN A. COCHRAN
          Cochran Douglas, PLLC
 4        2501 Fawcett Avenue
          Tacoma, WA  98402
 5        253.472.7777
          loren@cochrandouglas.com
 6
 7  FOR DEFENDANT CITY OF TACOMA:
 8        KIMBERLY COX
          JENNIFER TAYLOR
 9        Tacoma City Attorney's Office
          747 Market Street
10        Suite 1120
          Tacoma, WA  98402-3701
11        253.591.5885
          kcox@cityoftacoma.org
12        jtaylor@cityoftacoma.org
13
14  ALSO PRESENT:  MELODY SORENSEN, VIDEOGRAPHER
15
16            *  *  *  *  *
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1              EXAMINATION INDEX
 2  EXAMINATION BY:              PAGE NO.
 3  MR. COCHRAN                     5
 4
 5              EXHIBIT INDEX
 6  NO.   DESCRIPTION             PAGE NO.
 7  1   11-page Resolution No. 40622.      14
 8
 9  2   5-page City Council Action Memorandum dated   14
        6/25/20.
10  3   1-page spreadsheet.            21
11  4   1-page note to Chief Ake from Joel Cheney   44
        dated 5/24/21.  P/TPD JC 000017.
12
13  5   6-page Cad Incident Inquiry.  CONTRERAZ   65
        000229-234.
14  6   12-page Tacoma Police Department Use of   90
        Force Sub-Section 3.1.  CONTRERAZ
15      000518-529.
16  7   4-page Tacoma Police Department Incident   98
        Report.  Incident No. 2019401679.1.
17      CONTRERAZ 000831-834.
18  8   2-page Tacoma Police Department Supplemental   99
        Report.  Incident No. 2019401679.2.
19      CONTRERAZ 000833-834.
20  9   1-page Cad Incident Inquiry.  CONTRERAZ   111
        000235.
21
22
23
24
25
```

---

**Page 4**

```
 1              Tacoma, Washington
 2              November 14, 2023
 3              10:03 a.m.
 4              -o0o-
 5
 6        THE VIDEOGRAPHER:  We are now on the record.
 7  The time is 10:03 a.m. on March -- I mean November 14th,
 8  2023.  This is the video recorded deposition of Officer
 9  Christopher Bain in the matter of Contreraz versus City
10  of Tacoma, et al., in the United States District Court
11  Western District of Washington at Tacoma.  The case is
12  3:22-3 -- no, 3:22-cv-05106-BHS.
13        My name is Melody Sorenson from Buell Realtime
14  Reporting.
15        Will counsel please identify themselves for the
16  record?
17        MR. COCHRAN:  Yes.  For the Plaintiff
18  Contreraz, Loren Cochran.
19        MS. COX:  For the City of Tacoma, Kimberly
20  Cox.
21        MS. TAYLOR:  And also present for the City
22  of Tacoma, Jennifer Taylor.
23        THE VIDEOGRAPHER:  The court reporter today
24  is Barbara Castrow, who'll now swear in the witness.
25  ///
```

---

1 (Pages 1 to 4)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

---

Page 5

1    OFFICER CHRISTOPHER BAIN, witness herein, having been
2         first duly sworn under oath,
3              was examined and testified as
4         follows:
5
6         MR. COCHRAN:  For the record, South Sound
7    911 is another defendant in this case.  They were served
8    with a copy of the deposition notice.  My office did not
9    hear anything from them.  I'm assuming the City of
10   Tacoma did not either.
11        We're going to go ahead and progress without
12   Defendant South Sound 911's representation based on
13   their course and conduct regarding the past several
14   depositions.
15        EXAMINATION
16   BY MR. COCHRAN:
17        Q.  With that, sir, would you go ahead and say and
18   spell your last name for the record?
19        A.  Bain, B-a-i-n.
20        Q.  And what's your first name?
21        A.  Christopher.
22        Q.  What's your business address?
23        A.  37 -- 3701 South Pine Street in Tacoma,
24   Washington.
25        Q.  What business is at 3701 South Pine Street in

---

Page 6

1    Tacoma, Washington?
2         A.  It is the headquarters of the Tacoma Police
3    Department.
4         Q.  What's your position with the Tacoma Police
5    Department currently?
6         A.  Traffic enforcement officer.
7         Q.  How long have you been a traffic enforcement
8    officer with TPD?
9         A.  I accepted the position in April of this year.
10        Q.  Prior to being a traffic enforcement officer as
11   of April of this year, what was your prior position with
12   TPD, if any?
13        A.  Police patrol specialist.
14        Q.  What's the difference, as you understand it,
15   between a traffic enforcement officer and a police
16   patrol officer?
17        A.  My primary duties are traffic enforcement and
18   collision investigations as a traffic enforcement
19   officer.
20        Q.  Have you performed in that role in law
21   enforcement at any other time a traffic enforcement
22   officer?
23        A.  For a brief time, I believe in 2011, I was a
24   DUI enforcement officer, which was part of the traffic
25   division, I believe.  That was from 2011 to 2012, I

---

Page 7

1    believe.
2         Q.  Before you were a police patrol officer, did
3    you have a prior position with TPD?
4         A.  I did not.
5         Q.  So tell me when you first began at TPD.
6         A.  October of 2008.
7         Q.  So from October of 2008 until 2011, were you a
8    police patrol officer?
9         A.  I was.
10        Q.  And then how long were you in that DUI
11   enforcement unit?
12        A.  I believe a little over a year.
13        Q.  And then did you go back to police patrol
14   officer?
15        A.  I did.
16        Q.  In July of 2020, what was your position with
17   the Tacoma Police Department?
18        A.  A police patrol officer.
19        Q.  If you would for me, and I know this is a lot
20   to ask, but can you describe for me what your
21   understanding of your primary responsibilities were as a
22   police patrol officer with the Tacoma Police Department
23   in July of 2020?
24        A.  I was assigned to the 1 sector, which is
25   primarily downtown, which also includes Northeast

---

Page 8

1    Tacoma.  So I patrol that area, respond to calls as
2    dispatched as needed, patrol the area, conduct traffic
3    stops, person contacts, police enforcement activities in
4    my assigned area.
5         Q.  Did you have a partner that you were regularly
6    with in July of 2020?
7         A.  What -- please describe what you mean by
8    partner.
9         Q.  Well, I'm just using vernacular admittedly from
10   popular culture, but did you have somebody that you were
11   teamed up with on a semi or regular basis who --
12        A.  No, I was normally a one -- a one-officer car.
13        Q.  Did you have a specific unit number or badge
14   number that identified you?
15        A.  Yes.  As a swing shift officer, we are Paul
16   units if we're one-officer units, and my badge number
17   and my call sign is 273.
18        Q.  Have you always been -- has your call sign
19   always been 273?
20        A.  Yes, it has.
21        Q.  Before you became a Tacoma police officer, had
22   you worked in law enforcement previously?
23        A.  Yes.
24        Q.  My understanding is that was in Juneau, Alaska;
25   is that right?

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 9

1    A.  That is correct.
2    Q.  How long were you a police officer in Juneau,
3  Alaska?
4    A.  I was hired in February -- or January of 2006,
5  and I separated employment in September of 2008.
6    Q.  Do you remember what you were hired on as,
7  specifically what your title was with the Juneau Police
8  Department?
9    A.  At hire, it was recruit officer.  And then once
10  commissioned, it was police officer.
11    Q.  Did you go to an academy in Alaska?
12    A.  I did.
13    Q.  Where is that located?
14    A.  Sitka.
15    Q.  Did you also ultimately go to the academy here
16  in Burien?
17    A.  It was a modified lateral academy.
18    Q.  When was that, if you remember?
19    A.  I got hired in October of 2008.  I do believe
20  it was -- would have been beginning of 2009 once I got
21  through administrative duties and purposes at first
22  hire, so I believe it was the beginning.  I couldn't
23  give you the exact month.
24    Q.  Let me ask you, are you currently married?
25    A.  Yes, I am.

Page 10

1    Q.  And do you have any kids?
2    A.  Yes, I do.
3    Q.  How many children do you have?
4    A.  Four.
5    Q.  With regard to your background, it looked like
6  you got a bachelor's degree from Eastern Washington
7  University; is that right?
8    A.  That is correct.
9    Q.  Was that in 2005?
10    A.  I do believe that is correct.
11    Q.  Ever serve in the military?
12    A.  No.
13    Q.  Past Eastern Washington University's
14  bachelor's, did you take any other or have you taken any
15  other academic courses?
16    A.  Yes.  I'm about halfway through my master's
17  degree with Southern New Hampshire University.
18    Q.  Tell me the name of the university again.
19    A.  Southern New Hampshire.
20    Q.  When did you start that?
21    A.  Sometime during COVID.
22    Q.  So 2020, 2021?
23    A.  Yes.
24    Q.  Is there an emphasis that you are looking to
25  get your master's in?

Page 11

1    A.  Continuing criminal justice studies, and I
2  haven't decided a specific discipline within criminal
3  justice.
4    Q.  And I'm guessing that's online university?
5    A.  It is.  It would be a long commute if it was
6  not.
7    Q.  It would be a heck of a commute.
8    Do you have a certain caseload or credit load
9  that you have to keep every semester or quarter?
10    A.  Just one class.
11    Q.  Past your modified lateral academy in or about
12  2009, have you had any continuing career education, not
13  academic, but something that's more aligned to
14  continuing law enforcement education other than regular
15  training?
16    A.  My specialty is impaired driving and collision
17  investigation.  So I've received expert training in drug
18  recognition -- drug recognition training.  I'm a
19  certified DRE, drug recognition expert.  I'm an
20  instructor in the Draeger breath test machine.  I'm a
21  standard field sobriety field instructor.  I have basic
22  and advanced collision investigation training.
23    Q.  And where did you get that extra training?
24    A.  Most of the additional training is either
25  through the department or through the Washington State

Page 12

1  Patrol.
2    Q.  Is that training that you actually had to go
3  off site to get?
4    A.  Yes.
5    Q.  Let me ask about some other training you may or
6  may not have had.  Have you ever had any training on
7  racial bias in police enforcement?
8    A.  Yes, it is part of our required training that
9  we -- we have every year.
10    Q.  Okay.  When is the first time that you can
11  recall having racial bias in law enforcement or police
12  enforcement training with the Tacoma Police Department?
13    A.  To the best of my recollection, I can't give
14  you an exact date.  I would say within the last five to
15  ten years.
16    Q.  Tell me what you can recall about that
17  training.
18    A.  Well, their additional training was within --
19  with in-person instructors in-house, and since then it's
20  been online training.  But the bulk of it is recognizing
21  biases within the culture, within the community, within
22  ourselves and how to deal with those biases, recognize
23  them and correct them.
24    Q.  And so what does that mean to you when you are
25  being trained on recognizing bias, if anything?

3 (Pages 9 to 12)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

---

**Page 13**

1  A.  It means that based on the training that there
2  could be biases that somebody has that they are not
3  aware of.  And if it's brought to their attention, that
4  there are ways to recognize those biases and fix them,
5  correct them.
6  Q.  Now, I asked for a list of the training that
7  you've undergone, and I don't believe that I saw that
8  within your training.  Is that something where you are
9  actually getting some sort of credits for that?
10  A.  Usually it's -- from my recollection, it would
11  be in our quarterly training.  We would have a course or
12  be in our online training.  So if it's an online
13  training, I don't know that the department keeps a
14  separate record of that.  I just attend the training.
15  It's up to them to keep those records.
16  Q.  Have you been made -- strike that.
17  Have you been made aware of a city resolution
18  and affirmation to try and recognize and make an
19  emphasis on racial bias in law enforcement?
20  A.  Not -- nobody has come to me personally.  I try
21  not to pay attention to too many politics either, local
22  or national.  I just try to concentrate on the things
23  that affect me and that I can affect.  So if there is
24  something within the city, if I haven't received
25  specific training on it, then I have not been made aware

---

**Page 14**

1  of it.
2  MR. COCHRAN:  Let me ask, I'm going to ask
3  our court reporter Barbara to mark these two exhibits.
4  MS. COX:  As...?
5  THE COURT REPORTER:  1 and 2.
6  MR. COCHRAN:  Exhibits 1 and 2.
7  (Exhibit Nos. 1 and 2 marked.)
8  THE WITNESS:  Would you like me to review
9  this?
10  Q.  (By Mr. Cochran)  Yeah, in just a minute.  I
11  want to make sure counsel has a copy before you begin to
12  look at it.
13  And, yes, if you would go ahead and take a look
14  at what's been marked now for identification as Exhibits
15  1 and 2, I will identify them for the record.
16  Exhibit 1 is a copy of Resolution No. 40622.
17  It's a resolution issued by the mayor of the City of
18  Tacoma.  There's not a specific date on it.  It's my
19  understanding that it was issued in 2020.  It's
20  available as a public document from the City of Tacoma.
21  And Exhibit 2 is a city manager's memo or it's
22  to the city manager from the chief policy analyst to the
23  mayor.  And this is regarding a resolution affirming the
24  City of Tacoma's commitment to antiracist systems
25  transformation.  The date on this is 6/25 of 2020.

---

**Page 15**

1  And I just want to see if you were made aware
2  of either of these, the resolution or the memo from the
3  city -- to the city manager regarding police -- well, a
4  commitment to antiracist systems transformation.
5  MS. COX:  So the objection would be form if
6  that was a question.  I'm not sure if you were still
7  narrating the exhibit description or that was a
8  question.  But if it's a question, the objection is
9  form.
10  Q.  (By Mr. Cochran)  So I will go ahead and ask
11  the question.
12  Have you been made aware of either Exhibit 1 or
13  Exhibit 2 as an employee of the City of Tacoma at any
14  time?
15  A.  Exhibit 1 sounds like a broad policy that we
16  were made aware of.  We received training.  That's -- I
17  believe that's probably where the anti-biased police
18  training probably stemmed from.
19  As far as there being a Resolution 40622, it's
20  the first time I have seen it.  And I don't recognize
21  this memo from the city manager.
22  Q.  But you feel like this -- these two memos or at
23  least as you've been able to look at them encompass the
24  training that you testified that you received regarding
25  racial bias --

---

**Page 16**

1  MS. COX:  Object to form.
2  Q.  (By Mr. Cochran) -- and police enforcement?
3  MS. COX:  Sorry.
4  MR. COCHRAN:  That's all right.
5  MS. COX:  Objection; form.
6  Are there two memos or two exhibits?
7  MR. COCHRAN:  Sorry.  Both exhibits.
8  MS. COX:  Objection; form still.
9  Go ahead and answer if you can.
10  A.  I would say the scope and the purpose of these
11  would encompass the training that we've received, yes.
12  Q.  (By Mr. Cochran)  Do you recall if the -- and I
13  know you said you didn't know exactly, you thought it
14  was within the last five years, but do you remember if
15  it was closer to the June of 2020 date that you had some
16  sort of racial bias in law enforcement training from
17  Tacoma Police Department?
18  A.  Reviewing these documents does not help me
19  narrow down a date.
20  Q.  So tell me this specifically -- when I say
21  "this," I mean Resolution No. 40622 and the accompanying
22  memorandum, which is Exhibit 2, talks specifically about
23  concerns with the black community.  Was that a part of
24  the racial bias training that you believe you received
25  from the City of Tacoma?

---

4 (Pages 13 to 16)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

---

Page 17

1       MS. COX:  Objection; form.
2       Answer if you can.
3       A.  I do believe it was a part of the training.
4       Q.  (By Mr. Cochran)  From the training, can you
5   identify how you combat, as you were trained, racial
6   bias in law enforcement?
7       A.  How I combat racial bias that I see or racial
8   bias that I have?  Could you please be more specific?
9       Q.  Sure.  I'm just wondering how based on the
10  training, which you testified was in part to recognize
11  that there are inherent biases, tell me how you have
12  implemented that training to be aware of potential
13  racial biases in law enforcement.
14      MS. COX:  Objection; form.
15      Answer if you can.
16      A.  I'm sorry.  Could you repeat the question?
17      Q.  (By Mr. Cochran)  Sure.
18      How have you implemented the training you say
19  you received on racial bias in law enforcement to combat
20  any racial bias that you may have?
21      A.  To the best of my recollection, I haven't been
22  in a position where I needed to combat any type of
23  racial biases.
24      Q.  Have you had to confront any racial biases in
25  your position as a Tacoma Police Department officer?

---

Page 18

1       A.  With the public or with other officers?  Could
2   you be more specific, please?
3       Q.  In the actual enforcement.  So not with other
4   officers, but in any way in enforcement of the laws.
5       A.  I have -- I've handled a few hate crimes.  I
6   couldn't give you a number or date or instance, a
7   specific instance, but I have handled hate crimes cases.
8       And as I previously stated, my main area of
9   patrol was the Sector 1, which is the Hilltop area,
10  which has a large minority community or is largely a
11  minority community.
12      So I've been called by the public many -- many
13  racial slurs towards myself, and I have witnessed other
14  officers being called racial slurs including minority
15  officers.  And I have also dealt with the public using
16  racial slurs and biases towards each other.
17      Q.  Okay.  So what you've confronted on the Hilltop
18  is people saying racial slurs to you?
19      A.  And to other -- and the other citizens and
20  other officers as well, yes.
21      Q.  What kind of racial slurs have you heard while
22  on patrol in the Hilltop?
23      A.  Specifically I can recall being called a
24  cracker, a honky, hillbilly.  Those are the ones that
25  just come to -- just come to mind right away.

---

Page 19

1       Q.  Okay.  How did that make you feel when you were
2   called a cracker or a honky or a hillbilly?
3       A.  I don't take offense to it.
4       Q.  Any other instances you can think of where
5   you've had to at least confront your own racial bias in
6   police enforcement as a Tacoma Police Department
7   officer?
8       A.  Not to my recollection, no.
9       Q.  Have you ever felt like you may have an
10  inherent bias based on the color of a person's skin?
11      A.  No.
12      Q.  Have you had a chance to read a copy of the
13  lawsuit that was filed by my client Zim Contreraz?
14      A.  I don't -- I don't believe I have read it in
15  detail, no.
16      Q.  Have you read it at all?
17      A.  Yes, I've skimmed it, but I didn't -- I tend to
18  get lost in a lot of the legal language.
19      Q.  Tell me based on your understanding what's --
20  what's the lawsuit consist of with regard to your
21  actions and my client Zim Contreraz?
22      MS. COX:  And objection; form.
23      Answer if you can.
24      A.  From my understanding, the lawsuit is alleging
25  that I used excessive force when contact -- physically

---

Page 20

1   contacting Mr. Contreraz and pulled him back hard and
2   slammed him down on the picnic table.
3       Q.  (By Mr. Cochran)  Did you notice anything about
4   the lawsuit also alleging racial discrimination based on
5   Mr. Contreraz's skin color?
6       A.  I don't recall reading that.  I may have
7   skimmed over it or I just don't recall reading it.
8       Q.  Has anyone ever talked to you, and outside of
9   counsel, counsel's office on the 11th floor, has anyone
10  talked to you about the allegations of the lawsuit?
11      A.  No.
12      Q.  No supervisors have talked to you?  No one from
13  TPD has talked to you?
14      A.  No.
15      Q.  Have you talked to any other officers about the
16  lawsuit?
17      A.  The specific lawsuit or just the fact that
18  there is a lawsuit?
19      Q.  Well, that there is this specific lawsuit.
20      A.  When the lawsuit was first filed, I believe
21  there was an issue contacting Officer Erik Levitt, and
22  I've been in contact with him since he left.
23      So I made sure that he contacted the City's
24  attorneys so that they can contact him.  So that was a
25  contact I had with him regarding this lawsuit.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Contreraz v. City of Tacoma, et al.                          Officer Christopher Bain

Page 21

1    Q.  My understanding is Mr. Levitt has relocated to
2    Canada; is that correct?
3    A.  That is correct.
4    Q.  How often do you stay in contact with Erik
5    Levitt?
6    A.  Mainly through Facebook messaging on occasion a
7    couple times a year.
8    Q.  Have you talked to Erik Levitt about this
9    lawsuit?
10    A.  Only his need to contact the attorneys.
11    Nothing specific about the lawsuit.
12    Q.  How about anyone else, did you ever talk to
13    Kevin Jepson about the lawsuit?
14    A.  Not specifically the lawsuit, no.
15    Q.  How about the incident more generally?
16    A.  Not since the date of the incident.
17    Q.  And we'll get back to that in just a little
18    bit.
19    As a part of the exchange of information in
20    this case, we call it discovery, I was afforded a list,
21    and I will ask that to be marked as Exhibit 3.
22    (Exhibit No. 3 marked.)
23    Q.  (By Mr. Cochran)  And for the record, Exhibit 3
24    is a photocopy of an Excel spreadsheet that was provided
25    by the City of Tacoma in response to written questions

Page 22

1    that were authored and issued by my office.
2    To the best of my understanding, this is a list
3    that begins in 2011 based on the confines of the
4    particular database that this is contained within, but
5    this is instances in which you, Officer Christopher
6    Bain, had either a complaint levied against you or a use
7    of force.
8    Have you seen Exhibit 3 in any form prior to
9    today?  And it goes two pages.  It's -- if you just flip
10    it over, it's got the other part.
11    MR. COCHRAN:  And I apologize for the small
12    print.  That's the only way we could do an Excel
13    spreadsheet.
14    MS. COX:  Can you see it okay?
15    THE WITNESS:  Yeah, it's fine.
16    A.  I have not seen this specific -- these specific
17    pages, but I have seen the list of my -- of these
18    incidents when somebody does a PDR request -- of my
19    memory and from my experience, if somebody does a PDR
20    request, I get notified of that PDR request.
21    Q.  (By Mr. Cochran)  Have you been notified of a
22    PDR request in the past about either complaints or use
23    of force from you?
24    A.  Yes.
25    Q.  You have.  How many times do you figure?

Page 23

1    A.  To the best of my recollection, two or three
2    times.
3    Q.  When was the first time you were notified that
4    there was a PDR regarding use of force and complaints
5    levied against you?
6    A.  It was -- if I remember right, it was sometime
7    in 2011 or 2012 while I was a DUI officer was the
8    incident.  So to the best of my recollection, it was
9    probably a year after that, somebody had filed a lawsuit
10    against the city alleging excessive force, and they
11    PDR'd my history.  I believe that would have been the
12    first time.
13    Q.  Do you know -- so there was an actual lawsuit
14    that was filed?
15    A.  Yes.
16    Q.  And did it name you personally?
17    A.  It named the city and me personally, yes.
18    Q.  Do you remember who the plaintiff was in the
19    case?
20    A.  I could not tell you his name, no.
21    Q.  But it was stemming from an action in what year
22    was it?
23    A.  It would have been 2011 or '12.  It was while I
24    was a DUI enforcement officer.
25    Q.  Do you recall what the substance of the

Page 24

1    allocation was in the lawsuit?
2    A.  Yes, I do.
3    Q.  What was?
4    A.  I had contacted a vehicle that was stopped in
5    the middle of the road.  There was a large male driver
6    in the driver's seat, a large male in the driver's seat.
7    When I asked for his ID, he said it would be easier just
8    to kill him.
9    For his safety, I had him exit the vehicle and
10    conduct a pat-down search of his person, found marijuana
11    in his pocket, tried to place him under arrest, and he
12    fought myself and another officer.
13    We eventually got him into handcuffs and placed
14    him under arrest for the possession of the marijuana as
15    well as assaulting both myself and the other officer,
16    and he alleged excessive force.  And I believe the case
17    was dismissed.
18    Q.  That was my next question.
19    Do you recall any of the circumstances behind
20    the dismissal?
21    A.  I don't.
22    Q.  Were you deposed in that case?
23    A.  I was not.
24    Q.  Do you recall who the plaintiff was in that
25    case?

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

---

Page 25

1    A. I don't recall his name.
2    Q. Have you ever been named in any other lawsuit?
3    A. No.
4    Q. And that's aside from --
5    A. This one?
6    Q. Yeah, from 2011, this one or any domestic
7  lawsuits or anything like that.
8        I'm just taking a look at the teeny writing
9  myself because my eyes are not that good.
10       Beginning if you come down one, two, three,
11 four, five, six, seven, in 12COM-0028, there is a
12 complaint, there's actually three of them, for
13 insubordination, unsatisfactory performance and
14 truthfulness.
15       Two of those complaints were sustained
16 according to this sheet, the insubordination and
17 unsatisfactory performance. Truthfulness was not
18 sustained, and it was ordered by Captain CP Taylor and
19 served by Lieutenant Jewel Lerum.
20       Does that sound familiar?
21    A. Yes, it does.
22    Q. Tell me what you can recall about that
23 particular incident.
24    A. The day before or a couple days before I left
25 for DRE school, which was held in the middle of Oregon,

---

Page 26

1  I can't give you an exact city, I conducted a traffic
2  stop for the registration of a vehicle coming back with
3  the owner being suspended in the third degree.
4        Upon contacting the driver, the driver --
5  before I could say anything, the driver handed me a
6  license and said my license is suspended. It ended up
7  not being the registered owner of the vehicle, but
8  because they had admitted to driving while suspended
9  before I could even ask a question, I continued with the
10 suspended third arrest.
11       And I didn't document that incident, that
12 arrest, or the PC well enough for the sergeant at the
13 time who I believe was Verone.
14       So he sent me an email stating I needed to
15 correct the report. I was down in Oregon I said, but I
16 took my work computer to help study for the -- for the
17 DRE school. So I tried to fix the report remotely
18 through the Enforcer program. I thought that I had.
19       My normal procedure for writing reports is to
20 write it in a Word document to help with spelling and
21 grammar, and then I cut and paste.
22       On many occasions, some things don't transfer
23 over during the cut and paste, maybe I miss it, and that
24 must have happened here. I didn't correct it to
25 sergeant -- the sergeant's standards. He just replied

---

Page 27

1  and said, "You need to correct this."
2        I replied, "I did correct -- I did fix it,"
3  because I was under the assumption that I had corrected
4  whatever I needed to. I went back and re-read it and
5  then corrected it.
6        And then he said, "No, you need to re-correct
7  it."
8        And I responded, "I don't know what you -- what
9  more you need. Can you -- you need to be more specific.
10 I have corrected it."
11       He took that as insubordination and lying that
12 I actually corrected it. So when I returned from DRE
13 school, I was interviewed regarding that, and they
14 upheld the insubordination regarding the email and
15 unsatisfactory job performance of fixing my report in a
16 timely manner.
17       But the truthfulness was dismissed because of
18 the miscommunication and the communications with the
19 emails.
20    Q. Did you get any sort of counseling with regard
21 to the sustaining of the insubordination and the
22 unsatisfactory performance decisions?
23    A. To the best of my recollection, I do believe I
24 got verbal counseling on proper email etiquette and then
25 fixing reports in a timely manner, which is common on a

---

Page 28

1  first offense complaint sustained.
2    Q. Would you say that it's routine for Tacoma
3  police officers to receive sustained findings of
4  insubordination throughout the course of their career?
5        MS. COX: Objection; form.
6    Q. (By Mr. Cochran) If you know.
7    A. I haven't talked to any other officers based on
8  that particular complaint or the result of a complaint
9  of insubordination.
10    Q. How about just more generally, any
11 conversations that you've had with either supervisors or
12 fellow officers where they've indicated that getting a
13 sustained finding with regard to a charge of
14 insubordination is a regular occurrence with the Tacoma
15 Police Department?
16       MS. COX: Same objection.
17    A. Based on my recollection, I haven't heard of
18 insubordination being very common, no.
19    Q. (By Mr. Cochran) How about the same question
20 but with regard to unsatisfactory performance?
21       MS. COX: Same objection.
22       Answer if you can.
23    A. I typically don't talk to other officers about
24 trouble they've gotten into. And to my recollection
25 officers haven't come to me with -- when they get

---

7 (Pages 25 to 28)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 29

1  sustained complaints or when they get complaints.
2      Q. (By Mr. Cochran) Have you found throughout the
3  course of your career that there are attempts by TPD
4  managers to try and avoid levying a complaint against an
5  officer with regard to insubordination or unsatisfactory
6  performance?
7          MS. COX: Objection; form.
8          Answer if you can.
9      A. I don't have any knowledge of the department
10  doing that or not doing that.
11     Q. (By Mr. Cochran) Have you had instances where
12  a charge of insubordination or unsatisfactory
13  performance was threatened to be brought against you,
14  but you were given an opportunity to remedy whatever the
15  -- whatever the contentious point was?
16     A. No.
17     Q. In your experience if there is some sort of a
18  problem, supervisors have just filed a complaint against
19  you, is that right, rather than try and remedy whatever
20  the problem is?
21         MS. COX: Objection; form.
22         Answer if you can.
23     A. I'm sorry. Could you repeat the question?
24     Q. (By Mr. Cochran) Right.
25         In your experience as a Tacoma police officer,

Page 30

1  has it been -- has it been your experience that
2  allegations of either unsatisfactory performance or
3  insubordination have just been levied against you at a
4  complaint level rather than a manager trying to work
5  with you to remedy whatever the problem is?
6      A. In my experience, it's not an either or. If
7  there's a complaint levied, then a supervisor will work
8  with the officer to correct whatever issues they need
9  documented and -- what I believe either it used to be
10  called, I'm pretty sure they still call it the, blue
11  team, our blue team system.
12         So complaints are documented through the blue
13  team by supervisors. And then from there, they go with
14  whatever decision they make on how to go toward with the
15  complaint.
16     Q. If you look at 12COMM-0085, there's another
17  unsatisfactory performance complaint. Once again it's
18  sustained. It's ordered by Captain CP Taylor served by
19  Lieutenant Jewel Lerum.
20     A. You said 85, correct?
21     Q. Yeah, 0085.
22         Do you recall the substance of that complaint?
23  I believe this one involved a soft-sided rifle case that
24  was found unattended to or discarded.
25     A. Oh. I'm sorry. It doesn't say anything about

Page 31

1  the rifle case in the paper that I'm seeing.
2      Q. If you just look up one -- if you look at the
3  far right narrative.
4      A. Oh, I'm sorry. Now I see it, yes. The way
5  this is written, it looks like it's under the use of
6  force 0012 so --
7      Q. It's hard to read a spreadsheet on paper.
8      A. Yes, I do recall that.
9      Q. Okay. Tell me what to the best of your
10  recollection happened in that case.
11     A. When we are issued the rifles, we are issued a
12  case to go with them. The case at that time is a very
13  light, soft, padded case to keep the rifle in when it's
14  not in a safe or a rack in our vehicle.
15         The trunk of -- at the time, I was driving a
16  Crown Victoria. We keep lots of stuff in our trunks.
17  As a DRE, I have lots of equipment I have -- I take and
18  sometimes take in and out.
19         To the best of my recollection, I believe I did
20  evaluate a DRE evaluation on JBLM, Joint Base Lewis
21  McChord, and the -- I took some stuff out of my trunk to
22  get to the equipment that I needed. And there's a
23  chance that it was windy -- I do remember it was windy
24  that day. There's a chance that it blew out of my field
25  of view, and I didn't see to put it back in my trunk.

Page 32

1  And somebody had turned it in.
2      Q. And at that point, there was a sustained
3  unsatisfactory performance complaint issued against you.
4  Do you recall who from the department issued the
5  complaint?
6      A. I believe at the time my supervisor was -- his
7  name was Sergeant Waters. I believe as my supervisor,
8  he would have been the one to file the complaint to the
9  best of my recollection.
10     Q. Did you -- it says written counseling. Do you
11  remember getting written counseling?
12     A. I do.
13     Q. What was the substance of the written
14  counseling if you remember?
15     A. Since it was the second -- second
16  unsatisfactory performance, it goes from verbal
17  counseling to written counseling. And it's a documented
18  incident that I had lost a vital piece of equipment
19  being a rifle case, not the fact that it's just a case,
20  the fact that a rifle could have been inside the case
21  when lost. That's what made it a bigger deal than just
22  being a case.
23         And so the counseling was to take better care
24  of my equipment.
25     Q. Can you go down to 12COMM-0167? There are four

8 (Pages 29 to 32)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 33

1  complaints, unsatisfactory performance, employment
2  activities while on sick leave, return to work following
3  sick leave and off-duty policies, all of which were
4  sustained and included written reprimands.
5        Do you recall that particular incident?
6  A.  I do.
7        Q.  Tell me what you can recall about 12COMM-0167.
8  A.  I had gotten sick the couple days before I was
9  scheduled to work an offer-duty shift at a haunted house
10  within the City of Tacoma.  I was -- understood that
11  while on sick -- while you were sick, you couldn't work
12  off duty.  If you take time off work sick, you can't use
13  the time that you are supposed to be on patrol to work
14  an off-duty job.
15        So I had called in sick the day before.  The
16  next day I was supposed to work.  I was not scheduled to
17  work that day.  I didn't miss any work to work this
18  off-duty job.
19        But when I worked the job, I was contacted by
20  the sergeant and said, "You're still on the sick board."
21        And I said, "I'm no longer sick.  It was just
22  for yesterday."
23        And then he advised me to review the policy and
24  procedures on sick leave.  And I had to write him -- I
25  believe I had to write him a memo either to him or

Page 34

1  direct supervisor, which was still, I believe, Sergeant
2  Waters at that time indicating why I was working when I
3  was on sick leave.  And I just misunderstood the policy
4  of sick leave.
5        Q.  How would you characterize your overall
6  relationship with Sergeant Waters?
7  A.  It was -- it was fine.  He was a tough
8  supervisor, very much by the book.  I did a lot of -- a
9  lot of patrol activity and DUI enforcement during the
10  time, and DUI endorsement wasn't something he was very
11  familiar with.
12        So he would often have questions or issues with
13  some of the stuff that he thought I did wrong, and I
14  sometimes had to correct him.
15        We had a good working relationship while he was
16  my supervisor for about, I think, a period of about two
17  or three years, if that.
18        Q.  If you flip the page?  If you go down to
19  20COMM-0049, there are two complaints, one on
20  identification and the other one unbecoming contact --
21  conduct.  Both are sustained.  There's an oral
22  reprimand.
23        It's my understanding that that had to do with
24  a citizen who was taking video at a substation.  Is that
25  your recollection as well?

Page 35

1  A.  Yes, that's correct.
2        Q.  Do you recall other than the citizen, was there
3  a department complaint as well, someone that levied a
4  complaint against you from the department?
5  A.  To my recollection, I believe it was just the
6  citizen.  If there was a complaint by the department, I
7  don't recall that.
8        Q.  It says oral reprimand.  Do you recall what the
9  substance of the reprimand was?
10  A.  Yes, I do believe I do.
11        Q.  What was that?
12  A.  It was removing my name tag off of my uniform
13  and initially failing to identify myself.
14        Q.  Okay.  And as far as the reprimand, was it that
15  you needed to identify yourself and keep your name tag
16  on?
17  A.  Yes.
18        Q.  If you go down to 20COMM-0057, there's a
19  complaint regarding vehicle pursuit operations.  Again,
20  it was sustained, and this was a verbal warning.  Do you
21  recall what the substance of that was?
22  A.  I do.
23        Q.  Tell me what you can recall about that
24  complaint.
25  A.  There was other officers that were pursuing

Page 36

1  initially it was a stolen vehicle and a stolen boat.
2  That initial pursuit was called off once the vehicle got
3  too reckless.
4        That pursuit happened -- that part of the
5  pursued happened near Point Defiance Park.  And I was
6  still assigned to the downtown area.  So I wasn't part
7  of that pursuit.
8        When they terminated that, other officers found
9  the same vehicle with the boat on Ruston Way.  They
10  tried to make contact with that driver.  It was relayed
11  over our police radio that the driver had intentionally
12  tried to run people in order to flee their contact.
13        So they had probable cause for assault in the
14  second degree was the information that they had relayed
15  to us over the radio.
16        I believe there was two officers -- there was
17  two separate police vehicles that were pursuing after
18  that attempted contact on Ruston Way.  I was situated at
19  North -- Or South 21st and Pacific Avenue intersection
20  just in case the pursuit -- because they went from
21  Ruston Way to Schuster Parkway onto Pacific, and they
22  continued down Pacific.  And when they passed Pacific,
23  they were either going to go onto the freeway or
24  continue up Pacific.  Once they continued on Pacific, I
25  joined in.

9 (Pages 33 to 36)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

---

Page 37

1    The pursuit was called out over the radio.
2    Updates were given. No order was given to discontinue
3    the pursuit.
4        At that point, I was the third vehicle in the
5    pursued. It got onto I-5 southbound from Pacific
6    Avenue, and then it started -- then it went from the on
7    ramp all the way over to the left side of the freeway.
8    At that point, I was the second vehicle in the pursuit
9    because I was able to catch up and then go all the way
10   over behind the other vehicle -- behind the other police
11   vehicle.
12       And it continued to swerve. It went over,
13   like, it was going to get onto 16 and then Highway 16
14   going westbound, and then it continued southbound I-5,
15   got onto 74th where it hit another vehicle in a T-bone
16   style collision.
17       And the complaint was that I had violated the
18   pursuit policy, and I should have terminated the
19   pursuit.
20       **Q. And that was ultimately sustained; is that**
21   **right?**
22       A. Yes, it was.
23       **Q. What was the result? It says counseling; is**
24   **that right? Yeah, it says counseling or was that a**
25   **verbal warning?**

Page 38

1       A. The vehicle pursuit is a verbal warning.
2       **Q. There we go.**
3       **Do you recall who gave you the verbal warning?**
4       A. My sergeant at the time Todd Wimmer.
5       **Q. And the final one that is a sustained complaint**
6    **is 20COMM-0105. It says unsatisfactory performance, and**
7    **it had to do with a written traffic report that you had**
8    **authored regarding a collision between a driver and a**
9    **semi truck. Do you recall that?**
10      A. I do.
11      **Q. Okay. So what happened in that particular**
12   **case?**
13      A. The basis of the complaint is I did not contact
14   a witness that was -- had called in and that was in our
15   -- in the CAD call, computer automated dispatch call.
16   The collision happened on Portland Ave under I-5 during
17   rush hour traffic, which is a very busy time, lots of
18   traffic.
19       And I have a semi and then a vehicle, I
20   believe, that was pulling a trailer blocking multiple
21   lanes of traffic. I was on scene for, to the best of my
22   recollection, probably 45 minutes completing the report
23   and issuing the ticket.
24       And then I did not see that somebody had called
25   in and was a witness and was available for contact in

Page 39

1    the call. As I said, there was lots of traffic around.
2    My concern was being in the middle of traffic and my
3    safety as well as the safety of others and getting the
4    roadway cleared. So I did not see that there was a
5    witness to contact.
6        The person who I issued the ticket to disagreed
7    with my ticket, contested it in court, and then the
8    ticket was dropped. I believe that she got ahold of the
9    CAD call, saw that there was a witness and complained
10   that I did not contact the witness.
11      **Q. In that case, I read some of the documentation**
12   **that was submitted by the complainant that was turned**
13   **over pursuant to written discovery. And the complainant**
14   **said that it had cost her significant time, money and**
15   **mental anguish as a result of your actions on the case.**
16      **Prior to receiving a written complaint, were**
17   **there any efforts by that citizen to contact you about**
18   **the collision?**
19      A. I don't believe -- to my recollection, she --
20   after the contact at the collision, I don't believe
21   there was any other contact.
22      **Q. No attempts to try and get you to re-visit the**
23   **written report or anything like that?**
24      A. Not to my memory, no.
25      **Q. There was also talk about a tribal officer who**

Page 40

1    had arrived on the scene. Do you have any recollection
2    of that?
3        A. I think he arrived there before I got there.
4    Sometimes they do that when they are in the area for
5    traffic control because they are closer. I don't -- to
6    my recollection, I don't recall him writing any report
7    or documenting anything.
8        **Q. With regard to the overall sustained complaints**
9    **that you've had over the course of your work history at**
10   **the Tacoma Police Department, has anyone ever talked to**
11   **you about concerns about having this many sustained**
12   **complaints?**
13      A. No.
14      **Q. And you don't have any knowledge yourself as to**
15   **what an average amount of sustained complaints might be**
16   **for a TPD officer over the course of a career, do you?**
17      A. I do not.
18      **Q. Do you personally feel like you've had a lot of**
19   **complaints that have been sustained by the Tacoma Police**
20   **Department?**
21          MS. COX: Objection; form.
22          Answer if you can.
23      A. No, I don't have any concern.
24      **Q. (By Ms. Cox) But there's been no attempt to**
25   **the best of your knowledge either by supervisors or**

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

---

Page 41

1  anyone else to counsel you with regard to the importance
2  of not having sustained complaints throughout your work
3  with TPD?
4      A.  No.  The counseling I get is for the specific
5  complaints, and I haven't received any counseling
6  regarding the number of complaints.
7      Q.  You had a very difficult incident on 40th and G
8  Street in 2019, correct?
9      A.  That is correct.
10     Q.  With regard to what happened, did you ever get
11  counseling from the department to deal with the shooting
12  death of I think it's Hashim Wilson?
13     A.  Counseling as in what type of counseling?
14     Q.  You getting grief counseling, PTSD evaluation,
15  anything like that from the department.
16     A.  Yes.  We have an in-house mental health
17  specialist available to us any time we need.
18     Q.  Did you take advantage of that in-house mental
19  health specialist after the shooting death of Hashim
20  Wilson?
21     A.  I talked with Dr. Fitzpatrick is his name that
22  day, and he followed up with me once I returned to work
23  and, I think, a couple times after that just to check
24  in.  I did not have any scheduled sessions specifically
25  for that reason.

Page 42

1      Q.  How long were you out, do you recall, after --
2  I'm guessing it was an administrative leave?
3      A.  It was.
4      Q.  How long were you out on administrative leave?
5      A.  Well, I also had a scheduled vacation that just
6  happened to coincide with directly after the
7  administrative leave.  So I believe the administrative
8  leave was 10 to 14 days.  I can't recall which it was.
9          And then once -- I told them that I had tickets
10  to fly to the East Coast with the whole family, spent a
11  lot of money on it, and so once they told me I could go,
12  then I could go.  So I believe the administrative leave
13  ended within 10 to 14 days.
14     Q.  And other than a couple of just follow-up phone
15  calls, you didn't have any other mental health therapy,
16  counseling or even an evaluation in the wake of the
17  shooting death of Hashim Wilson?
18     A.  No.
19     Q.  That was in July of 2019; is that right?
20     A.  That sounds correct.  I'm bad with dates so --
21  but that sounds correct.
22     Q.  If -- and there's a lot of paperwork in this
23  case.  But if my recall is correct, do you remember you
24  learning that the use of force had been deemed justified
25  by the Pierce County Prosecutor Mary Robnett's office

Page 43

1  just prior to the incident in Wright Park involving my
2  client Zim Contreraz?
3      A.  I don't recall those dates being close
4  together.
5          MR. COCHRAN:  I'm going to take a break
6  because I need to use the restroom, and I want Barbara's
7  fingers to have a break too.  So do you want to do,
8  like, five minutes or let's come back at 11:05.
9          MS. TAYLOR:  Okay.
10         THE VIDEOGRAPHER:  Going off the record --
11  going off the record at 10:57 a.m.
12         (Recess was taken from 10:57 a.m. to
13         11:03 a.m.)
14         THE VIDEOGRAPHER:  We're back on the record
15  at 11:03.
16     Q.  (By Mr. Cochran)  Officer Bain, tell me about
17  your relationship -- well, let me ask you this:  Do you
18  know the name Joel Cheney?
19     A.  I do.
20     Q.  And how do you know the name Joel Cheney?
21     A.  He was a coworker -- he was a fellow officer at
22  the Tacoma Police Department, but he has since removed
23  -- separated his employment and passed away.
24     Q.  He left in, from what I saw, September of 2021.
25  Does that sound about right?

Page 44

1      A.  That sounds about right.
2      Q.  How often did you work with Joel Cheney, if at
3  all?
4      A.  Mostly it was in passing.  We were assigned to
5  opposite sides of the city.  He was assigned to the
6  south end, and I was assigned to the north end of the
7  city.  So if we worked in the same area, it was only
8  when bodies were needed to be moved around, so it was
9  sparingly.
10     Q.  Did you consider him a friend?
11     A.  No.
12     Q.  Do you have any knowledge about an internal
13  affairs complaint that was apparently alleged with
14  regard to Joel Cheney?
15     A.  No.
16     Q.  I'm going to hand you what I will ask be marked
17  as Exhibit 4.
18         (Exhibit No. 4 marked.)
19         MR. COCHRAN:  You have a copy.
20         MS. COX:  Oh, do I?
21         MR. COCHRAN:  Yeah, that's the little --
22         MS. COX:  Oh, thank you.
23     Q.  (By Mr. Cochran)  And go ahead and read it.
24  And once you've had a chance to read it, just let me
25  know.

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 45

1    A. (Peruses document.)  Okay.
2    Q.  The second reads -- and just for the
3  record, this was produced as a part of the personnel
4  file for former Officer Joel Cheney.  The identification
5  at the bottom is P/TPD JC and the last two digits are
6  17.
7        It appears to be a -- either an email or a
8  letter that was sent to Chief Mike Ake from Joel Cheney.
9  And the second sentence reads, "My decision to submit my
10  resignation was made in the wake of being placed on
11  emergency administrative leave in regards to a complaint
12  made against me which I'm told is being investigated by
13  internal affairs."
14        Are you aware of any internal affairs complaint
15  or investigation with regard to Joel Cheney other than
16  what's in front of you?
17    A. I -- you hear things within the department, but
18  nothing substantiated as far as formal -- formal
19  discipline or formal complaints.
20        I do recall him resigning and then coming back
21  and then resigning.  But the specifics of that were
22  never made public as far as my recollection or my
23  memory.  And as far as I know, the department didn't
24  release any official statement.  So it was -- it was
25  never told to us why.

Page 46

1    Q.  What was -- what did you hear with regard to
2  any possibilities as to why there was an internal
3  affairs investigation that was either suspected or could
4  have or was actually brought regarding Joel Cheney?
5        MS. COX:  Objection; form.
6        Answer if you can.
7    A. The rumors that I've heard is that he possibly
8  had issues with pain killers related to a back injury
9  that he had either during the military or during his
10  work as a police officer.
11    Q.  (By Mr. Cochran)  Anything other than that?
12    A. That's the -- that's the extent of my knowledge of his
13  issues and the possible complaint.
14    Q.  Do you recall generally the incident which is
15  the subject of this complaint for damages in the lawsuit
16  regarding my client Zim Contreraz?
17    A. Do I recall the incident?
18    Q.  Yeah, do you recall?
19    A. Yes, I do.
20    Q.  Tell me to the best of your recollection how
21  you first got involved in what ended up being an
22  interaction with Zim Contreraz.  How do you remember
23  first being contacted?
24        MS. COX:  Objection; form.
25    A. At the time I was a training officer, and my --

Page 47

1  the officer I was training is Erik Levitt.  When I'm
2  training other officers, newer officers, I try to give
3  them as much experience as possible.
4        I believe this incident happened at the
5  beginning of the overlap between swings and graves.
6  Grave shift comes in at 8 o'clock or whenever -- their
7  shift starts at 8 o'clock and whenever they get out of
8  their turn out, the meeting at the department, they are
9  usually -- calls are usually held for the graveyard
10  officers so swing yard officers can do reports.
11        Being that I was training Officer Levitt, I
12  wanted to give him as much experience as possible.  When
13  stuff comes out, I like to get them involved and stuff
14  to get the officers into the habit of being more
15  proactive and helping other officers out, being -- and
16  volunteering for stuff instead of just waiting for calls
17  to come to them.
18        It's kind of officer riding.  That's what I try
19  to impart to my student officers.  So I encourage them
20  when stuff comes out, if they can go help, to go do
21  that.
22        So we assisted in this call because even though
23  it was in the 2 Sector, we were assigned to the 1
24  Sector.  It was on the border between those two sectors.
25  And we went to go back up -- or we initially went to go

Page 48

1  help do an area check for the suspect.  To the best of
2  my recollection I believe it was an intimidation with a
3  weapon call around Tacoma General Hospital.
4        The person had ran towards Wright Park, which
5  would be eastbound from the hospital.  And we were at
6  the substation at the time that the call came out, so we
7  headed in that direction.  And before we got to the area
8  to do the area check, Officer Cheney had contacted
9  somebody near the conservatory at Wright Park, which is
10  on the east side of the park, which is G Street, which
11  is just next to G Street.
12    Q.  Let me stop you right there.  Which subsection
13  were you and then Officer Levitt at?
14    A. The substation?
15    Q.  Or substation I mean.  Sorry.
16    A. The 1 Sector substation at 16th and MLK.
17    Q.  Okay.  Sorry about that.  Go ahead.
18    A. And to my recollection, that's where we were at
19  to either do paperwork or eat.  That was our common
20  practice.
21        So we had gone to the area, and Officer Cheney
22  had contacted somebody, and we went to go back him up
23  being that if it was intimidation with a weapon, the
24  person possibly had a weapon, and we needed to get there
25  to help assist in determining whether this person was

12  (Pages 45 to 48)

Contreraz v. City of Tacoma, et al.                                        Officer Christopher Bain

Page 49

1    involved or not.
2         So we went to the location where Officer Cheney
3    had contacted the individual later identified as
4    Mr. Contreraz.
5         Q.  Okay.  Do you recall anything else about the
6    interaction with officer -- or Mr. Contreraz?
7         A.  Yes.  We parked in the park right on the
8    walking path.  And to my recollection, Officer Cheney
9    was talking to Mr. Contreraz.  Mr. Contreraz was leaning
10   -- had -- it was a table about this height, and he was
11   sitting on the edge of the table.  He wasn't sitting
12   with his whole weight being supported by the table but
13   more leaning up against the table.
14        And he had -- to my recollection I thought he
15   had been handcuffed.  I did not engage in any
16   handcuffing of Mr. Contreraz.  And then we stood by
17   while Officer Cheney had tried to make contact with the
18   officer who made initial contact with the victim, and he
19   had tried to do that over the radio.
20        I believe there was communication issues
21   because the officer that made contact with the victim
22   was from a different department, if I remember right, I
23   believe it was Dupont, who was leaving Tacoma General
24   Hospital.
25        So there was some communication issues, so it

Page 50

1    was taking longer than normal.  And I think Officer
2    Cheney had to eventually make contact with somebody over
3    the phone.
4         While he was doing that, Mr. Contreraz to --
5    based on my extensive training and experience in dealing
6    with impaired people, appeared to be highly impaired.  I
7    smelled alcohol on his breath and person.  He had
8    slurred speech.  He had repetitive speech.  I couldn't
9    judge his balance or stance as, sa I previously stated,
10   he was leaning up against the table.
11        He was belligerent, and he was accusing us of
12   only contacting him because of the color of his skin.  I
13   tried to emphasize to Mr. Contreraz that the other
14   officer thought he matched the clothing description, and
15   people often, after they commit a crime, they remove
16   some clothing to try to get away or try not to be
17   noticed.
18        Mr. Contreraz was not receptive to what I was
19   saying.  He continued to be belligerent.  I told him if
20   he wasn't the person, he would be released within a
21   matter of minutes once we were able to confirm with the
22   other officer or the victim.
23        And Officer Cheney was -- or Mr. Contreraz was
24   leaning up against the edge of the table.  Officer
25   Cheney would have been standing directly in front of

Page 51

1    him, if I remember right, within five to ten feet.
2         Officer Cheney's attention was not on
3    Mr. Contreraz since he was talking on his radio and, at
4    some point, I believe had walked over to his vehicle and
5    talked on his phone.
6         So my attention was on Mr. Contreraz, not on
7    Officer Cheney.  At one point, Mr. Contreraz had stood
8    up from the table and made a step towards Officer
9    Cheney.  I grabbed with my left hand, my non-dominant
10   hand, the handcuffs and told him that he needed to sit
11   back down.  I applied enough backwards pressure to
12   assist him in sitting back down.
13        And then Mr. Contreraz did sit -- when I say
14   sit down, lean up against the table and half sitting
15   down on the edge of the table, which he complied but
16   then continued to be belligerent until he was released
17   by Officer Cheney who eventually had made contact with
18   the victim and the description wasn't close enough, and
19   we were able to eliminate him as a suspect.
20        Once we released him, he continued to be
21   belligerent with us.  And then he insisted on talking to
22   a supervisor, and that is when we requested Sergeant
23   Jepson, who was the 2 Sector supervisor on graveyard
24   shift.  So he's the one that responded.
25        And Sergeant Jepson was -- while Sergeant

Page 52

1    Jepson was on his way, he told us we did not need to
2    stay there, and he would contact Mr. Contreraz when he
3    got there.  We left.
4         Q.  How long did you stay on scene after Sergeant
5    Jepson came?
6         A.  I don't believe we were there -- I don't recall
7    being there while Sergeant Jepson was there.  If we
8    were, it was very briefly.  Being a student -- being a
9    training officer and having a student, when we clear a
10   call, when we finish the call, we get back in the car.
11   There's usually a conversation, so it's back and forth
12   how did that call go, what the officer saw, what he did,
13   training conversations.
14        So we don't usually leave the scene right away
15   unless there's an immediate need to.  So if we did, my
16   -- my focus was on Officer Levitt.  It wasn't on whether
17   Sergeant Jepson had arrived or not.
18        Q.  Okay.  Let me break down a little bit of what
19   you said.
20        You said that Mr. Contreraz appeared highly
21   impaired; is that right?
22        A.  I believe I specifically said intoxicated.
23        Q.  I think you started with impaired, but you say
24   that he was intoxicated?
25        A.  Yes.

13 (Pages 49 to 52)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 53

1    Q.  And how did you specifically come to the
2    determination at least in your mind that Mr. Contreraz
3    was highly intoxicated on July 12th of 2020?
4        A.  As I stated, he had a strong odor of alcohol on
5    his breath.  I could smell it even at a distance.  I did
6    not stand directly next to him.  I kept a safe distance
7    from him.
8        I could hear that he had thick, slurred speech.
9    He repeated his speech very often.  He had bloodshot and
10   watery eyes.  And if I remember right, I do believe a
11   couple of times he did even tell us that he had been
12   drinking.
13   Q.  That's -- that's what you recall?
14   A.  Yes.
15   Q.  Okay.  And you said that Mr. Contreraz was
16   seated long ways at the picnic table at Wright Park near
17   the conservatory at the end of the table; is that right?
18       A.  That is correct.
19   Q.  Do you remember where his hands were at the
20   time that you engaged him?
21       A.  The initial contact or the time I actually made
22   physical contact?
23   Q.  When you made physical contact.
24       A.  His hands were cuffed behind his back.
25   Q.  Okay.  Do you recall which side of the table

Page 54

1    you were or which side of Mr. Contreraz you were located
2    at?
3        A.  I would have been to his right since I used my
4    left hand to contact him.
5        Q.  So it's your testimony here today that you were
6    on the right side of Mr. Contreraz as he was seated and
7    facing out towards the hill that goes down at Wright
8    Park?
9        A.  I believe so, yes.  I believe he was down the
10   hill, but, yes, I was definitely on his right-hand side.
11   Q.  And were you directly behind him or were you
12   kind of canted behind him or directly to the right of
13   him?
14       A.  I couldn't be directly behind him because the
15   table was directly behind him.  I was to his right
16   slightly off to the back for safety, for officer safety
17   reasons.  It's a much safer position to be.
18   Q.  Where was Officer Cheney at this time?
19       A.  I believe he -- for the most part, he was
20   directly in front of Mr. Contreraz.  Being that he was
21   either on his radio or phone, he was walking around when
22   he was not directly in contact with Mr. Contreraz.
23       When I made physical contact, I don't recall if
24   he was still there or if he had gone to his vehicle.  As
25   I said, my focus was on Mr. Contreraz, not where Officer

Page 55

1    Cheney was.
2        Q.  Okay.  Who else was there from the Tacoma
3    Police Department?  It was you, Erik Levitt, Joel
4    Cheney.  Do you remember who else was there?
5        A.  I believe Officer Branham was there as well.
6        Q.  Anybody else?
7        A.  To my recollection, I don't recall anybody else
8    being on scene, but there could have been.
9        Q.  Do you recall anyone other than Tacoma Police
10   Department employees that were located in the immediate
11   area to where Zim Contreraz was handcuffed on a picnic
12   table in Wright Park?
13       A.  When you --
14       MS. COX:  Sorry.  Objection; form.
15       Answer if you can or re-ask the question.
16       A.  When you say immediate area, what kind of area
17   are you talking about.
18   Q.  (By Mr. Cochran)  I'm talking within 15 feet of
19   where you were.
20       A.  Within 15 feet, no, we were the only people
21   within 15 feet.
22   Q.  How about within 50 feet?
23       A.  Being that it was dark, there could have been
24   somebody within 15 feet.  There's a possibility we
25   wouldn't have been able to see them.

Page 56

1    Q.  Okay.  Do you have any recollection of two
2    people who were on a picnic bench or were at a picnic
3    bench close enough to where you confronted Mr. Contreraz
4    that they were able to walk over and actually witness
5    your interaction with Zim Contreraz on July 12th of
6    2020?
7        MS. COX:  Objection; form.
8        A.  I do recall there was two people in the park as
9    well that we noticed that were behind our location.  So
10   if they are behind the direction that Mr. Contreraz is
11   facing, so if we're concentrating on Mr. Contreraz, we
12   wouldn't be aware of them behind us.  But I couldn't
13   give a distance of how close they were.
14   Q.  (By Mr. Cochran)  Describe those two people if
15   you can.
16       A.  I could not.  It was dark.  I just was aware of
17   two people and just to make sure they weren't getting
18   any closer to for officer safety reasons.
19   Q.  Okay.  So you can't -- can you describe their
20   gender?
21       A.  No, I did not get close enough to give any
22   description of the two people at all.
23   Q.  So they weren't -- strike that.
24       Do you remember anyone that was close enough
25   where they actually would have been able to see you

14 (Pages 53 to 56)

Contreraz v. City of Tacoma, et al.                          Officer Christopher Bain

Page 57

1   interact with Zim Contreraz on July 12th of 2020?
2       MS. COX:  Objection; form.
3       A. I don't know that I can testify what anybody
4   else could see when it's dark outside in the park and
5   whether the lights were on or not working at the time.
6       Q. (By Mr. Cochran)  And it's your testimony that
7   at the time that you interacted with Zim Contreraz on
8   July 12th of 2020 in Wright Park in Tacoma, that the
9   light -- that it was dark at that time; is that right?
10      A. To my recollection, it was dark when we were
11  contacting Mr. Contreraz.
12      Q. How dark?  Was it pitch dark?  Was it dusky?
13  Was it just before dusk?
14      A. It was dark enough to where it was difficult to
15  see beyond where the lights were.
16      Q. Did that include difficulty seeing what
17  Mr. Contreraz was wearing?
18      A. At -- while I was talking to him, while I made
19  contact with him on initial approach?
20      Q. Yeah.
21      A. Once I -- once I contacted him, it was easy to
22  see what he was wearing as I was close enough to see.
23      Q. What was he wearing, if you can recall?
24      A. I don't recall.
25      Q. What was it about Zim Contreraz as a responding

Page 58

1   officer that you thought his description was close
2   enough to that of the suspects who allegedly intimidated
3   someone with weapons at or around Wright Park on July
4   12th of 2020?
5       A. I don't recall --
6       MS. COX:  Hold on, please.
7       Objection; form.
8       Q. (By Mr. Cochran)  Go ahead.
9       A. I don't recall reading the description as in,
10  like I said, we -- while driving to the area, Officer
11  Cheney had said he had contacted somebody, so our focus
12  isn't reading at that time.  Our focus isn't reading the
13  specifics of what's in the call.  It is responding to
14  back up an officer.
15      So our job wasn't to search for anybody at the
16  time.  It wasn't to pay attention to the description.
17  It was to get to where the officer was to back him up to
18  make sure that he and everybody there was safe.
19      So when I arrived on scene, I hadn't read the
20  call or known what the description of the person was.
21  My job there at the time was to back up Officer Cheney.
22      Q. Was there -- was there a call from Dr. -- or
23  strike that.
24      Was there a call from Officer Cheney or anyone
25  else that described the situation as volatile such that

Page 59

1   there was need for backup?
2       A. The fact that the call was an intimidation with
3   weapon, and he was contacting somebody who matched the
4   description, that's enough.  You don't need to announce
5   that it's volatile.  Those specifics would make it
6   enough to where you would want to get there sooner than
7   normal driving conditions.
8       Q. Were you there when Zim Contreraz or someone
9   else emptied the bag that he had with him?
10      A. I do recall that he -- after we had un-
11  handcuffed him, he told us we could search his backpack.
12  And, like, we told him it wasn't necessarily.  We had
13  already eliminated him.
14      And he dumped it -- from my recollection, he
15  dumped it out himself and told us to look inside the
16  backpack or bag.
17      Q. What, if anything, did you find inside the bag?
18      A. I did not search the contents of the bag.  We
19  had already eliminated him when we were breaking our
20  contact with Mr. Contreraz.
21      Q. But to the best of your recollection as you sit
22  here today, he had already been un-handcuffed, Zim
23  Contreraz, at that point?
24      A. Yes.
25      Q. And you don't remember any bystanders remarking

Page 60

1   that your actions were out of line; is that right?
2       A. That is -- that is correct.
3       Q. What, if anything, did you do about your
4   observations that led you to believe that Zim Contreraz
5   was highly intoxicated?
6       A. What do you mean what did I do?
7       Q. What did you do about having a drunk guy in the
8   park if you believed he was highly intoxicated?  Did you
9   do anything about that?
10      MS. COX:  Objection; form.
11      Answer if you can.
12      A. He was able to walk away under his own power.
13  He did not want our help.  Officer -- Sergeant Jepson
14  was on way -- on his way to talk to him because he had
15  requested the sergeant if he needed any further help, he
16  could have asked for it.  But he didn't -- at no time
17  during our contact, did he ask for any type of
18  assistance, and I didn't believe that he needed to be
19  hospitalized or needed medical attention due to his
20  intoxication.
21      Q. (By Mr. Cochran)  Did you tell Kevin Jepson
22  that he was -- in your opinion, he was about to confront
23  someone who was highly intoxicated and belligerent?
24      A. I believe --
25      MS. COX:  Objection; form.

15  (Pages 57 to 60)

Contreraz v. City of Tacoma, et al.                        Officer Christopher Bain

---

Page 61

1      THE WITNESS:  Sorry.
2      I do believe I did inform Sergeant Jepson that
3   Mr. Contreraz was intoxicated and belligerent.
4      Q. (By Mr. Cochran)  What did he say, if anything?
5      A.  He acknowledged the information and said that
6   he would be there to contact him and we did not need to
7   stick around.
8      Q.  Have you ever seen any videos that the
9   plaintiff Mr. Contreraz took of that evening?
10     A.  No, I have not.
11     Q.  I will represent for you that in the video,
12  which he took on his cell phone and it's my
13  understanding that he put on social media live, that
14  there are a number of officers who are parked along the
15  side of the street where the conservatory is in Wright
16  Park.
17     And they all appear to be staring at
18  Mr. Contreraz according -- based on my interpretation of
19  the video.
20     Does that recollect with your memory at all of
21  that evening of staying around and looking at
22  Mr. Contreraz after the interaction with him?
23     MS. COX:  Objection; form.
24     Answer if you can.
25     A.  I don't recall -- I don't recall seeing him as

---

Page 62

1   I previously stated.  My -- that was teaching -- I was
2   teaching Officer Levitt, as he's the student officer, so
3   my focus was on him.  We were discussing the call prior
4   to us leaving.
5      So I don't recall seeing anything about anybody
6   videotaping, including Mr. Contreraz.
7      Q. (By Mr. Cochran)  And is today the first time
8   you've heard about a videotape or a video recording?
9      A.  I -- I believe the attorney did tell me that he
10  did videotape.
11     Q.  And I'm not allowed to know --
12     A.  Sorry.  I wasn't sure.
13     MS. COX:  It's okay.
14     Q. (By Mr. Cochran)  I should have given you the
15  proviso.
16     Other than Ms. Cox or Ms. Taylor or anybody in
17  their office, had you heard from anyone else that there
18  was -- there was video?
19     A.  No.
20     Q.  Okay.  In the wake of your interaction with
21  Mr. Contreraz at Wright Park on July 12th of 2020, did
22  you do anything else?
23     A.  Can you be more specific?
24     Q.  Sure.
25     After you and Recruit Officer or Officer Erik

---

Page 63

1   Levitt left Wright Park on July 12th of 2020 after
2   interacting with my client Zim Contreraz, did you do
3   anything?
4      MS. COX:  Objection; form.
5      Answer if you can.
6      A.  Until recently, I did not have recollection of
7   writing any reports other than training officer reports
8   that I would have conducted as a result of training
9   Officer Levitt.
10     But it was brought to my attention within the
11  last 24 hours that I did in fact write what is called a
12  Field Information Report as a supplemental report
13  documenting the incident.
14     Q. (By Mr. Cochran)  A FIR, right, an F-I-R?
15     A.  That is correct.
16     Q.  Okay.  First off, tell me about what you wrote
17  in the training officer log.
18     A.  I don't recall what I specifically wrote.
19     Q.  Would that still exist to the best of your
20  recollection --
21     A.  We --
22     Q.  -- or knowledge?
23     A.  Since then, I believe we've changed programs,
24  so I couldn't tell you whether that documentation is
25  still available or not.

---

Page 64

1      Q.  Based upon your experience is the interaction
2   with Zim Contreraz on July 12th, 2020, with Training
3   Officer Levitt something that, again, based on your
4   experience you would have noted in the training officer
5   notes?
6      A.  It's possible depending on how busy the shift
7   was and if there was any bigger incidents we would have
8   documented.
9      Q.  Well, typically what, based on your experience,
10  do you document in those training logs?
11     A.  If the student officer either does something
12  really good or makes a mistake, I believe those are
13  documented.  If there's any type of big calls that the
14  student officer has not handled or has had issues in the
15  past and has corrected those, we would document that.
16     If it's a busy shift, we would stick to the
17  bigger calls, shootings, stabbings, DV assaults type of
18  reports to document.
19     If it's a slower shift, we would still find
20  some stuff to document during the shift.  So we might --
21  an incident such as this where there's no arrest made,
22  there was no property booked, and there's very little
23  interaction between the student officer and the person
24  we contacted, that might have ended up in the training
25  report, but also possibly not.

16  (Pages 61 to 64)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain



Page 65

1    Q. If it was something that was enough for you to
2    create a field incident report, would it be your
3    expectation that you also documented it within the
4    training log?
5    A. Not necessarily because the bulk of the contact
6    with Mr. Contreraz was between myself and him. So I
7    wouldn't include that in a training report. That would
8    be to document Officer Levitt's training.
9    Q. Today do you know where those training logs
10   would be located? I know you said you thought the
11   system had changed. Are they normally something that is
12   computerized that you submit electronically or is there
13   a paper form?
14   A. Computerized.
15       MS. COX: So my objection would be form.
16       And I saw you give an answer so...
17   Q. (By Mr. Cochran) I will have you take a look
18   at one of the CADs. This will be Exhibit No. 5.
19       (Exhibit No. 5 marked.)
20   Q. (By Mr. Cochran) Okay. Officer Bain, I've
21   handed you what's been marked as Exhibit 5. This has
22   been entered into other depositions prior to yours.
23       But please take a look at it. It consists of
24   pages, and it's got Bates numbers at the bottom. That's
25   what we use to identify documents, Contreraz 229 through

Page 66

1    Contreraz 234.
2        And as you take a look at this, I want to ask
3    if you've seen this document in any form prior to today,
4    computerized, maybe one that did not include a check at
5    the beginning which says Include State Messages, any
6    form of this CAD Incident Inquiry.
7    A. In printout form or, like, on the computer?
8    Q. Electronic or print.
9    A. During the night of the incident on --
10   displayed on our computer, most of this CAD information
11   is in there. When it's printed, I believe some of the
12   stuff that might not be available in our computer ends
13   up in some of these. But this looks like it would have
14   contained everything that would be in our computer.
15       I have not seen it in printed form other than
16   conversations --
17   Q. And I get to know if you saw the document.
18   A. Okay.
19   Q. I just get to know what the communications are.
20   A. Okay.
21   Q. So have you seen it before today?
22   A. I believe so, yes.
23   Q. Okay. Did you have a chance to look it over?
24   A. Yes.
25   Q. And were you basing your testimony previously

Page 67

1    on your recollection refreshed with what's been marked
2    as Exhibit 5?
3    A. No. There's not a whole lot of information
4    that I've testified to that's in this CAD call.
5    Q. Okay. So the information that you relayed
6    isn't necessarily -- well, strike that.
7        The information that you relayed previously in
8    your testimony is not reflected in the CAD call; is that
9    right?
10   A. Your question was was my memory refreshed and
11   did I base my testimony based on this CAD call.
12   Q. Right. And your answer was most of the things
13   that you testified to were not in this CAD call. Is
14   that right?
15   A. That's correct.
16   Q. Is there any particular reason why you didn't
17   note in what's been marked as Exhibit 5 the observations
18   that you had with regard to Zim Contreraz?
19   A. Because I included it in my field information
20   report.
21   Q. Okay. And is there any particular reason, and
22   I haven't seen it, but is there any particular reason
23   there was no effort made to identify Mr. Contreraz?
24       MS. COX: Objection; form.
25       Answer if you can.

Page 68

1    A. My recollection, there was effort made but
2    Mr. Contreraz refused. And I did document that in my
3    field information report.
4    Q. (By Mr. Cochran) I want to walk you through
5    what's been marked as Exhibit 5. So if you would refer
6    to that for me.
7        At system time 20:34:26 on the first page,
8    which is marked 229 of Exhibit No. 5, it reads DU16
9    flagged down by subject, advised he was chased out of
10   Wright Park by two subjects, one had gun, one had knife,
11   black male, gray tank top, long black shorts, white
12   male, black shirt, blond or brown hair. And then it
13   says OCC'D 5-10 ago.
14       Do you see that portion?
15   A. I do.
16   Q. Okay. I think you identified before that you
17   thought there was another officer from a different
18   department involved in the call; is that right?
19   A. Yes.
20   Q. And is that DU16?
21   A. Yes.
22   Q. And to the best of your knowledge, that's a
23   Dupont officer; is that right?
24   A. Yes.
25   Q. If you look a couple entries down to 20:35:54

17 (Pages 65 to 68)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

---

Page 69

1  just below that, there's an identification of DU16 and
2  then in parentheses (DUPD195) Drake, Kyle.
3        Do you recognize the name Kyle Drake?
4  A. I don't recall ever meeting Kyle Drake.
5  Q. Okay. Based upon your experience as a Tacoma
6  police officer, would it be your expectation that DU16
7  also identified as (DUPD195) is in fact Kyle Drake
8  according to this CAD Incident Inquiry?
9  A. Yes.
10  Q. You see the description that talks about two
11  subjects being the concern of the call; is that right?
12        MS. COX: Objection; form.
13  A. Yes.
14  Q. (By Mr. Cochran) One is a black male who
15  allegedly had a knife with a gray tank top and long
16  black shorts and then a white male with black shirt,
17  blond or brown hair.
18        Do you see that portion?
19        MS. COX: Where are you referring to?
20        MR. COCHRAN: 20:34:26. We identified it
21  earlier, the same page, 229.
22        MS. COX: So you are going back to the entry
23  you identified initially?
24        MR. COCHRAN: Correct. Same page.
25  A. And to correct you, in the call it doesn't say

---

Page 70

1  which one had the knife or which one had the gun. It
2  just says that one had a knife -- one had a gun, one had
3  a knife, and then it goes into the description. It does
4  not indicate which one had the knife and which one had
5  the gun.
6  Q. What do you see to be the description of the
7  black male?
8  A. Black male, gray tank top, long black shorts.
9  Q. Okay. And then with him allegedly is a white
10  male wearing a black shirt and blond or brown hair --
11        MS. COX: Objection; form.
12  Q. (By Mr. Cochran) -- Is that right?
13        MS. COX: Sorry. I jumped again.
14        MR. COCHRAN: That's okay.
15        MS. COX: Objection; form.
16  A. That's what was reported.
17  Q. (By Mr. Cochran) At any point on July 12th,
18  2020, were you looking specifically for two subjects
19  that were identified as one being a white male, one
20  being a black male with the descriptions that we just
21  looked at in system time 20:34:26 of the CAD Incident
22  Inquiry?
23  A. When we first started going towards the call,
24  we were going to look for the subjects. But before we
25  could get to that point, while enroute, Officer Cheney

---

Page 71

1  had contacted the male there identified as Contreraz.
2        So at no point did we search for the person.
3  But by the time we were done talking to or with our
4  contact with Contreraz, I believe the other officers who
5  had done the area check were unable to locate anybody.
6  So the other officers had taken care of that part of the
7  call.
8  Q. Unable to locate any black males or white
9  males; is that right?
10  A. Anybody that matched the description.
11  Q. Okay. But who actually matched the description
12  of a black male with a gray tank top and long black
13  shorts?
14  A. To the best of my recollection.
15  Q. And a white male with a black shirt and blond
16  or brown hair; is that right?
17  A. Correct.
18  Q. If you flip the page, you will see, and I'm
19  imagining that you saw when you reviewed this document,
20  Officers Ruanni Franco, of course Joel Cheney who is
21  identified in the previous page, Brandon Scheetz,
22  Jonathan Douglas. That looks like that's it's for this
23  particular page.
24        Do you remember those individuals also
25  assisting with the call at Wright Park on July 12th of

---

Page 72

1  2020?
2  A. I don't recall all the officers that assisted
3  because they could have been doing the area check, and I
4  wouldn't have been made aware of that because I would
5  have been outside of my vehicle.
6  Q. Okay. If you look on the second page of
7  Exhibit 5, Contreraz 230 is the Bates number on the
8  bottom of that page, and if you go down to the system
9  time of 20:41:12?
10  A. Okay.
11  Q. It reads, DU16 WM was the subject with the gun,
12  small black gun, possible Glock, BM had the knife. What
13  does that entry mean to you, if anything?
14  A. It means when we contact either somebody that
15  matches the white male or black male, we know what type
16  of weapon they were reported to have had.
17  Q. Okay. And from this, what type of weapon does
18  the white male allegedly have?
19  A. The gun.
20  Q. And how about the black male?
21  A. A knife.
22  Q. Were you looking for a white male with a gun
23  and a black male with a knife in Wright Park on July
24  12th of 2020?
25  A. As I previously stated, I didn't do any area

---

18 (Pages 69 to 72)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 73

1  check for any subjects.
2      Q.  If you flip the page to what is now marked 231
3  in the Bates numbers?
4      A.  (Complies.)
5      Q.  If you look at system time of 20:50:04?
6      A.  Which one?
7      Q.  The first one.  It says Dispatched.  It has
8  P145 (TPD205807) Christopher -- or Bain, Christopher.
9      A.  Hold on just one moment.  I lost my microphone.
10     Q.  And then P145 (TPD213311) Levitt, Eric.  Did I
11 read that correctly?
12     A.  You did.
13     Q.  What is that indicating to you on the CAD
14 system or incident inquiry at 20:50:04, the dispatch
15 call?
16     A.  Myself and Student Officer Levitt were
17 dispatched to the call, either we added ourselves on the
18 radio or on the computer to the call.
19     Q.  Just below that with the same system time, but
20 this time it says Event Remark, it says P145 -- P145
21 assisting U344.  Did I read that correctly?
22     A.  Yes.
23     Q.  And what does that mean to you, if anything?
24     A.  It means we're assisting Union 344, who I
25 believe is Officer Cheney.

Page 74

1      Q.  And at that point were you and former Officer
2  Levitt still at Substation 1?
3      A.  I don't recall.
4      Q.  If you go down to Event Remark, system time
5  20:57:45, there's a U344, which again I think is Officer
6  -- former Officer Joel Cheney.  It says Secure TPLE11,
7  all units heading to Wrights Park.  What, if anything,
8  does that narrative say to you?
9      A.  That since we're dealing with an officer with
10 another department who does not have our primary
11 channels, we need to switch to a side channel in which
12 we can communicate with that officer directly instead of
13 playing radio with our dispatchers and their
14 dispatchers.  It's a much more efficient form of
15 communication.
16     Q.  What does TPLE11 mean, if anything?  Is that
17 the channel?
18     A.  Yes.
19     Q.  And all units heading to Wrights Park, does
20 that mean anything to you?
21     A.  It means any units on this call will head to --
22 will switch to that channel.
23     Q.  And head to Wright Park?
24     A.  All units that are heading to Wrights Park
25 switch to that channel.

Page 75

1      Q.  I see.
2      If you go down to system time 20:59:14, U344,
3  it notes BM, buff, do rag, tank top with knife, white
4  male, firearm, facial hair, blank t-shirt -- or black
5  T-shirt, shorts.  Did I read that correctly?
6      A.  Yes.
7      Q.  Again, you were not looking for -- it's your
8  testimony that you were not looking for any specific
9  suspect when you headed to Wright Park; is that right?
10     A.  No.  I said when we started heading towards
11 Wright Park, our intention was to look for suspects.
12 But while in route there, officer Cheney had contacted a
13 suspect, and we went to back officer Cheney up instead
14 of doing the area check for the suspects.
15     Q.  I see.
16     So just below that U344 at system time
17 21:00:02, it notes that there's PC felony harassment on
18 both.  What does that mean to you?
19     A.  I'm sorry.  Can you repeat the timestamp?
20     Q.  Sure.  21:00:30.
21     A.  Okay.  21:00.  Okay.  I got it now.
22     Q.  Oops.  I'm sorry.  It's 21:00:02.
23     A.  There it is.  Okay.  Yep.
24     It means that there is felony -- probable cause
25 to arrest either of those subjects matching if they are

Page 76

1  positively identified for the charge of felony
2  harassment.
3      Q.  Does that change anything or did that change
4  anything for you when you were responding to Wright Park
5  on July 12th of 2020?
6      A.  No.
7      Q.  If you continue onto the next page.  And
8  actually you can turn to the next page, which is
9  Contreraz 233.
10     If you go down to system time 21:12:45.
11     A.  Okay.
12     Q.  There's a P145.  That's you, right?
13     A.  Yes.  That's -- that is the designation for
14 Officer Levitt and myself.  It's not -- it's not my
15 designator.  It's not my -- it's Officer Levitt's who we
16 signed under.  So that was myself and Officer Levitt's
17 designator.
18     Q.  Sure.  And let's go up a little bit just to
19 make it more clear.
20     If you go up to system time 21:12:30, it says
21 arrive.
22     A.  Uh-huh.
23     Q.  The narrative reads P145, and again it gives
24 your -- what I believe is your badge number, Bain,
25 Christopher, and then P145, and I believe that's the

19 (Pages 73 to 76)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 77

1  badge number of Erik Levitt, that's arrive time.
2       Below that at 21:12:30 there's an enroute, and,
3  again, there's a narrative of P145 again that has your
4  name and P145 Erik Levitt.
5       Below that at 21:12:31, P145's location south
6  3rd Street/South G Street.  And then just below that,
7  21:12:31, P145 Comments:  Black male, red shorts.
8       Why, if you were not concerned about the
9  description of the individual at Wright Park when you
10 actually arrived with Joel Cheney, did you make a
11 comment within the CAD Incident Inquiry about the black
12 male wearing red shorts?
13       MS. COX:  Objection; form.
14       Answer if you can.
15       A.  Can I go back and correct you a little bit on
16 the badge number?
17       Q.  (By Mr. Cochran)  Sure.
18       A.  Okay.  Paul 145 is Officer Levitt's badge
19 number.  The TPD205807 is my employee number.  And then
20 the TPD213311 is Officer Levitt's employee number.
21       I'm -- as an instructor or instructing officer, teaching
22 officer, we sign in under the student officer's badge
23 number.  So I just wanted to correct that.
24
25       Q.  No, I appreciate that correction.

Page 78

1       And you would actually be P273; is that right?
2       A.  That is correct.
3       Q.  Okay.  So everything here that is being entered
4  in is entered into under P145.  But for this particular
5  call, that includes yourself, Christopher Bain and Erik
6  Levitt; is that right?
7       A.  That's correct.
8       Q.  Okay.  So the same question with regard to
9  21:12:31, there's comments from P145, either yourself or
10 Erik Levitt, commenting that there's a black male with
11 red shorts.
12       Again, based on your earlier testimony that you
13 were not concerned about what the description of the
14 individual was when you arrived to assist Joel Cheney,
15 why are there comments about a black male wearing red
16 shorts?
17       MS. COX:  The same objection.
18       Answer if you can.
19       A.  I don't recall saying that I wasn't concerned
20 about the description.  I recall saying that I -- my
21 focus was on getting to back up Officer Cheney in he was
22 possibly contacting somebody with a weapon.  Two
23 different things.
24       And as to why those comments were made, I don't
25 recall.  Sometimes when we arrive on scene, we may not

Page 79

1  have heard an officer give an update of who they had or
2  an update of the suspect description.  And I don't
3  recall if either myself or Officer Levitt made the
4  comment.  Those would have been made over the radio
5  because that's SS03 -- 0233, those would have been added
6  by dispatch.
7       So from my understanding of the CAD system, I
8  don't recall who made the comments over the radio about
9  the black male, red shorts.
10       Q.  Okay.  But you agree with me that it came from
11 P145?
12       A.  As long as the dispatcher entered that
13 information correctly.  It's possible that somebody else
14 could have said it, and they misheard the officer that
15 said it and entered the wrong officer.  I can't testify
16 to that right now.
17       Q.  Here we look at U344, Joel Cheney, and he --
18 his number, his user number, is listed at system time
19 21:12:40 there's actually two entries at 21:12:40,
20 available, dispatched.
21       And then 21:12:41, enroute.
22       And then below that, it says event remark at
23 21:12:41, U344 -- U344 assisting P145.
24       Did I read that correctly?
25       A.  You did.

Page 80

1       Q.  Okay.  Before you testified that you were
2  assisting Joel Cheney --
3       A.  Yep.
4       Q.  -- U344.
5       Here Joel Cheney is indicating at least to
6  South Sound 911 and the dispatcher that he in fact is
7  assisting P145.  Right?
8       A.  That's what the CAD call says.
9       Q.  Okay.  And below that, there's a P145 entry
10 again, this time at 21:12:45, and P145 now is
11 identifying the same individual with a black tank top
12 and red shorts, right?
13       A.  It says black tan, red shorts.
14       Q.  Wouldn't that be black tank top, red shorts?
15       A.  Possibly.
16       Q.  Okay.  Again, why, if based on your prior
17 testimony, you weren't concerned about what the
18 individual was wearing, but in fact you said that you
19 came to assist U344 Joel Cheney is P145 remarking that
20 the individual that's being questioned has a black tank
21 top and red shorts?
22       MS. COX:  Objection; form.
23       Answer if you can.
24       A.  I can't answer as to why Joel Cheney would say
25 that or what information he gave.  And, again, I never

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

---

Page 81

1  said I wasn't concerned with the clothing. My main
2  focus was to back up an officer not -- so I didn't say I
3  wasn't concerned.
4        Q.  Right.  Back up an officer who at least
5  indicated to dispatch that he was assisting you, right?
6        MS. COX:  Objection; form.
7        Go ahead and answer.
8        A.  That -- that doesn't mean that he was assisting
9  us.  Sometimes dispatch inadvertently pulls somebody
10 from a call and has to reattach them to a call when
11 there's multiple officers on the call because when
12 there's this many officers, it can be a lot for one
13 dispatcher to move people around, add somebody to either
14 the call, the location, the notes from the officer that
15 they give over the radio.
16       And in my experience, I've been pulled from a
17 call inadvertently or they've put me in the wrong
18 location.  And then in order to put me back at the
19 proper location, they have to attach -- if another
20 officer is at the location, they attach that officer to
21 that location so it looks like they are assisting, but
22 really they were there the entire time.
23       You would have to ask South Sound 911 as to why
24 they had those notes.  I cannot testify to that.
25       Q.  Okay.  Then let's find out what happened with

---

Page 82

1  Ruanni Franco.  At system time 21:13:07, event remark --
2  sorry -- dispatched, U358, name Franco Ruanni.  Just
3  below that, 21:13:07, event remark, U358, which, again,
4  appears to be Ruanni Franco, assisting P145, right?
5        A.  That's what it says.
6        Q.  Okay.  So in order to follow the logic that you
7  just explained, the dispatcher itself, Puget Sound 911,
8  made a mistake with regard to Joel Cheney assisting P145
9  and Ruanni Franco; is that right?
10       MS. COX:  Objection; form.
11       Answer if you can.
12       A.  I can't testify whether they made a mistake or
13 why their reason of adding that, but they were not
14 assisting us, as we were assisting officer Cheney.  And
15 I had no idea what Ruanni Franco was doing.  I don't
16 recall seeing him there.
17       Q.  (By Mr. Cochran)  Do you know who -- let's see.
18 U057 appears to be John Branham, is that the
19 way you read this report as well, if you go down to
20 21:15:05 in the system time?
21       A.  Correct.
22       Q.  Okay.  If you go to system time 21:15:11,
23 again, we're on Page 233, Contreraz 233 of what's been
24 marked for identification to the deposition of
25 Christopher Bain.

---

Page 83

1        21:15:11 says U057 1 detained; is that right?
2        A.  That is correct.
3        Q.  Based on your recollection of July 12th of 2020
4  and your reading of this CAD Incident Inquiry, is that
5  one detained person Zim Contreraz?
6        A.  Based on my recollection of events, I don't
7  recall if John Branham was around anybody else that was
8  detained, but he was on scene with us when Mr. Contreraz
9  was detained.  So it could have been Mr. Contreraz that
10 he was talking about being detained, but I can't testify
11 if he was around anybody else that was detained or not.
12       Q.  Okay.  That's at 21:15:11.
13       And then if you go down a couple of entries to
14 21:21:25, so just over six minutes later, it reads, Unit
15 S197 -- sorry.  Go just below that.
16       21:25:48, Unit 344, that's Joel Cheney, subject
17 no longer detained, has been advised that he's free to
18 leave for several minutes now.
19       Do you see that portion?
20       A.  I do.
21       Q.  There are very few entries in the CAD Incident
22 Inquiry between 21:15:11 when an individual was detained
23 and 21:25:48 that the subject is no longer detained.  Do
24 you agree with me?
25       A.  Yes.

---

Page 84

1        Q.  There's no mention that the person you've
2  detained is highly intoxicated, right?
3        A.  Correct.
4        Q.  No mention that he is belligerent, right?
5        A.  Correct.
6        Q.  No mention that his bag has been searched,
7  correct?
8        A.  Correct.
9        Q.  No mention that he has at all met the probable
10 cause for arrest, which had been indicated earlier in
11 the CAD Incident Inquiry, right?
12       A.  Correct.
13       Q.  Recognizing that you testified that you did not
14 -- you were not the one who was the acting officer on
15 scene, but you were actually assisting Joel Cheney, can
16 you tell me why the individual who was a black male
17 wearing red shorts in Wright Park on July 12th of 2020
18 was contacted and ultimately detained by the Tacoma
19 Police Department?
20       MS. COX:  Objection; form.
21       Answer if you can.
22       A.  I can't tell you why Officer Cheney decided
23 that he was going to contact Mr. Contreraz other than he
24 felt that he matched the description enough to at least
25 make contact and eliminate him as a suspect.  As I have

---

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Contreraz v. City of Tacoma, et al.    Officer Christopher Bain

---

Page 85

1  previously testified, sometimes people will shed
2  clothing. They'll have on -- in my experience in
3  searching people, they'll have multiple layers of
4  clothing on even in the summertime, especially for
5  people who intend to commit crimes.
6        So it is quite possible that the clothing might
7  not match, but maybe the physical descriptors will match
8  more. But you'd -- I can't -- I cannot testify as to
9  why Officer Cheney decided he was going to contact and
10  detain Mr. Contreraz.
11        Q. But you would agree with me that Officer Cheney
12  is not the one indicated in Exhibit No. 5 who entered in
13  comments that there was a black male with red shorts
14  wearing a black tank top and red shorts in this call,
15  right?
16        MS. COX: Objection; form.
17        A. I thought he did make a comment that there was
18  a black male with red shorts, didn't he?
19        Q. No, that's you. That's your unit, P145.
20        In fact, if you look at the earlier
21  description, the black male had a gray tank top and long
22  black shorts.
23        MS. COX: Objection; form.
24        I'm not sure if that's a question.
25        Q. (By Mr. Cochran) Right?

---

Page 86

1        MS. COX: The same objection; form.
2        Q. (By Mr. Cochran) 229, the very first page, the
3  second entry down, system time 20:34:26.
4        MS. COX: And the question is?
5        Q. (By Mr. Cochran) He realizes that within
6  Exhibit 5, the CAD of July 12th of 2020, the only person
7  that identified Zim Contreraz's clothing as black tank
8  top, red shorts was P145, not Joel Cheney, according to
9  this CAD Incident Inquiry of July 12th of 2020.
10        MS. COX: Okay. The objection is form.
11        A. I'm looking for the part on here where it
12  describes the clothing. I'm sorry.
13        Q. Sure. No. 2 on Page 1.
14        A. No, no, that when we listed -- not the Dupont
15  officer. When you are stating that I -- that Paul 145
16  described the clothing, I'm looking for that.
17        Q. Sure. 233, Page 233, the first event remark is
18  at 21:12:31. P145 comments black male, red shorts.
19        And then if you go five entries down --
20        A. Wait. You are correct. Yes, so the only entry
21  listing Mr. Contreraz's clothing is by either myself or
22  Officer Levitt. I don't recall which one of us gave
23  that information.
24        Q. And both Officer Cheney, according to this, and
25  Officer Franco appear to be assisting P145 in the

---

Page 87

1  detention of what ultimately turned out to be Zim
2  Contreraz, right?
3        MS. COX: Objection; form.
4        A. The CAD states that they assisted us. But if
5  you go chronologically, we assisted -- we assisted
6  Officer Cheney first, and then Officer Cheney is removed
7  from the call and then put back on it immediately. That
8  does not mean he is assisting us.
9        When we initially attached ourselves to the
10  call, we were assisting Officer Cheney, and that is
11  listed chronologically.
12        Q. It sure looks like, Officer Bain, that P145 was
13  in fact looking for the suspects that were identified at
14  21:34:26 on July 12th of 2020, but that the individual
15  identified by P145 did not match those identifiers that
16  were previously sent out, right?
17        MS. COX: Objection; form.
18        A. Again, we did not make contact with
19  Mr. Contreraz. Officer Cheney made contact. We were
20  backing Officer Cheney.
21        And as I have stated, people often shed
22  clothing to conceal themselves or to change their
23  appearance when they are committing crimes.
24        Q. That's not what this document says, right?
25  This document says P145 is the one that was identifying

---

Page 88

1  a black male with red shorts and a black tank top,
2  right?
3        MS. COX: Objection; form.
4        And as soon as he answers, I would like to take
5  a break.
6        THE WITNESS: Okay.
7        MR. COCHRAN: I just want to finish up this
8  line of questioning.
9        MS. COX: Yeah, I need a break. So can you
10  answer the question?
11        A. Okay. Yes. So in my experience, my 15, 17
12  years of experience as a law enforcement officer, if
13  Officer Cheney is making first contact, his mind is not
14  going to be to get on the radio and give a color
15  description of the person he's contacting instead of
16  contacting the person, detaining them to make the scene
17  -- himself and the suspect and the scene safe.
18        So if the officer responds -- if an officer
19  responds quick enough, he can give the description of
20  the person of the clothing of the person they are
21  detaining for the officers who are contacting victims.
22        It does not mean the person giving the clothing
23  description is the person making the contact. We did
24  not make initial contact with Mr. Contreraz.
25        Q. (By Mr. Cochran) The only thing that matched

---

22 (Pages 85 to 88)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 89

1   the description was the fact that Zim Contreraz was a
2   black man in Wright Park, correct?
3           MS. COX:  Objection; form.
4           Answer if you can, and then I need to take a
5   break.
6       A.  Yes.
7           THE VIDEOGRAPHER:  Oh.  Going off the record
8   at 12:06.
9           (Recess was taken from 12:06 p.m. to
10          12:47 p.m.)
11          THE VIDEOGRAPHER:  We're back on the record
12  at 12:47.
13      Q.  (By Mr. Cochran)  Officer Bain, we left when we
14  were talking about the Cad Incident Inquiry, which has
15  been marked as Exhibit 5.
16      A.  Okay.
17      Q.  Do you recall anything else that you did or
18  Training Officer Levitt did at Wright Park before you
19  left?
20      A.  No.
21      Q.  Okay.  It's my understanding -- well, strike
22  that.
23          As a part of your training, are you familiar
24  with the use of force policy for the Tacoma Police
25  Department?

Page 90

1       A.  Yes, I am.
2       Q.  Okay.  I will submit to you that this has been
3   provided to me.  I'm going to ask Barbara to mark it as
4   Exhibit 6.
5           (Exhibit No. 6 marked.)
6       Q.  (By Mr. Cochran)  If you would, take a look at
7   this.  And this was provided by the City of Tacoma in
8   response to, again, my written questions to the city
9   regarding this lawsuit.
10          It's my understanding that what's in front of
11  you marked as Exhibit 6 is the Tacoma Police
12  Department's use of force policy, it's listed as
13  Subsection 3.1, that was in effect on July 12th of 2020.
14          Have you seen this use of force policy as it
15  exists in front of you recently?
16      A.  Yes.
17      Q.  Okay.  And you are familiar with the one that
18  actually has former Chief Donald Ramsdel's name on it?
19      A.  Yes.
20      Q.  Okay.  Can you confirm that what's in front of
21  you as Exhibit 6 to the best of your understanding is
22  the use of force policy that was in effect for the
23  Tacoma Police Department on July 12th of 2020?
24      A.  I don't have every word memorized, but it does
25  look correct.

Page 91

1       Q.  It appears to be what you were working off of
2   at the time?
3       A.  Yes, sir.
4       Q.  Okay.  And did you feel that it was to the best
5   of your understanding your job as a Tacoma police
6   officer back in July of 2020 to know the use of force
7   policy and to implement that policy when you were out on
8   patrol?
9       A.  Yes.
10      Q.  With regard to your testimony thus far, how
11  would you characterize your interaction with the
12  plaintiff, Mr. Contreraz, on July 12th of 2020?
13          MS. COX:  Objection; form.
14          Answer if you can.
15      Q.  (By Mr. Cochran)  And when I ask how would you
16  characterize that, I'm asking within the force model or
17  use of force model as it's sometimes called, and it
18  exists on Page 1 of 12, again, marked for identification
19  in your deposition as No. 6.  It begins on Contreraz
20  Page 518.
21      A.  Are you asking what part of the model were we
22  at during the contact?
23      Q.  Correct.
24          So you had contact with Mr. Contreraz, correct?
25      A.  Yes.

Page 92

1       Q.  You've testified that you put your hands on the
2   handcuffs that he was in, correct?
3       A.  Correct.
4       Q.  Is handcuffing an individual considered a use
5   of force?
6       A.  At the time, it was not.
7       Q.  But is it now?
8       A.  I don't believe so it is now.
9       Q.  Okay.  Are there any substantive changes that
10  you are aware of from July of 2020 to today that are
11  significantly different than the policy that's in front
12  of us right now?
13      A.  No.
14      Q.  Okay.  So how would you characterize your
15  interaction with Zimmeri Contreraz on July 12th of 2020?
16          MS. COX:  Objection; form.
17      Q.  (By Mr. Cochran)  Again, within the use of
18  force model.
19          MS. COX:  Same objection; form.
20          Answer if you can.
21      A.  In my training and experience, my understanding
22  of the use of force model, Mr. Contreraz was passive
23  resistant, and my reaction was that -- rise to a
24  level of contact controls with Mr. Contreraz to get him
25  to cooperate voluntarily.

23  (Pages 89 to 92)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

---

Page 93

1    Q.  (By Mr. Cochran)  Okay.  And that again was
2  you, as you testified, putting your hands -- you said
3  you were to the left of him?  No, you were to the right
4  of him?
5    A.  Correct.
6    Q.  And you put your left nondominant hand on the
7  handcuffs and applied pressure to get him to sit back
8  down on the table; is that right?
9    A.  Correct.
10    Q.  Okay.  If you flip the page and you go to it's
11  Page 11 of 12 of this document.  And, again, it is front
12  and back.  The identifier is Contreraz 528.  And if you
13  go to B, the Use of Force Reporting Instructions, it
14  reads, "The use of force reporting is intended to
15  quantify applications of force and provide specific
16  training correction for those tools, tactics and
17  techniques which are applied unsuccessfully or
18  incorrectly.  The reporting is also intended to allow
19  supervisors an opportunity to identify training issues
20  and assess skills and tools."
21    Under that, it says, "A reportable use of force
22  is defined as any incident where, under color of
23  authority, a Tacoma Police Officer employs a contact
24  control," and then it says where injury occurs, "tool
25  (excluding Draw and Direct) or any physical force to:

---

Page 94

1  Compel a non-compliant person to obey their direction,
2  overcome active resistance during an arrest or
3  detention, defend self or another from an aggressive
4  action by a suspect.
5    "Officers who employ a reportable use of force
6  shall specify those actions within the narrative section
7  of the report.  Additionally, if the officer wishes to
8  (and if warranted) make specific training
9  recommendations regarding tool effectiveness and
10  training proficiency, the Officer should collaborate
11  with the supervisor so the aforementioned can be
12  included in the comments section of the Blue Team
13  entry."
14    Did I read that correctly?
15    A.  Yes.
16    Q.  Okay.  In this particular case, you used a
17  contract -- contact control; is that right?
18    A.  Correct.
19    Q.  You did not report this as a use of force
20  however, right?
21    A.  What do you mean I did not report it as a use
22  of force?
23    Q.  You did not -- you never made a reportable use
24  of force or use of force report, did you?
25    A.  I don't -- at the time, patrol officers did not

---

Page 95

1  do their own use of force reports.
2    Q.  Okay.  Did you indicate to anyone that there
3  was a reportable use of force on July 12th of 2020?
4    A.  I would not have used the word reportable use
5  of force.  I would have described the incident to my
6  sergeant describing my actions and the actions of the
7  suspect that we had contacted and then collaborate to
8  decide whether a reasonable -- a report would be needed
9  to document the use of force or not.
10    Q.  Okay.  In this case, would you agree that you
11  were trying to compel Mr. Contreraz, who you've
12  described as a noncompliant person, to obey with the
13  direction?
14    A.  Correct.
15    Q.  Okay.  To whom within the Tacoma Police
16  Department did you describe your interaction with
17  Mr. Contreraz on July 12th of 2020?
18    A.  Sergeant Jepson.
19    Q.  Was it your expectation that Sergeant Jepson
20  would have created a reportable use of force report?
21    MS. COX:  Objection; form.
22    Answer if you can.
23    A.  I can't answer what Sergeant Jepson would or
24  would not have done.
25    Q.  (By Mr. Cochran)  And specifically how did you

---

Page 96

1  tell Sergeant Jepson that you had used a contact control
2  which was designed to compel a noncompliant person to
3  obey direction?
4    MS. COX:  Objection; form.
5    A.  To my recollection, I believe I called him via
6  telephone, contacted him via telephone.
7    Q.  (By Mr. Cochran)  During that telephone call,
8  did you tell him that Mr. Contreraz was allegedly highly
9  intoxicated?
10    A.  To my recollection, I believe I did.
11    Q.  Based on your training with regard to DUIs, you
12  knew that including whether or not someone was highly
13  intoxicated was important to any of your report writing,
14  correct?
15    A.  Yep.  I'm sorry.
16    MS. COX:  Objection; form.
17    Q.  (By Mr. Cochran)  And it was important to any
18  narrative that you gave to any supervisor as well,
19  right?
20    MS. COX:  Same objection.
21    A.  Correct.
22    Q.  (By Mr. Cochran)  The fact that Zim Contreraz,
23  Plaintiff Contreraz, was highly intoxicated during the
24  interaction with you and other officers on July 12th of
25  2020 at Wright Park was an important thing that you knew

---

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 97

1    that needed to be included in any narrative --
2          MS. COX: Objection.
3          Q. (By Mr. Cochran) -- created by you, correct?
4          MS. COX: Objection; form.
5    A. Correct.
6          Q. (By Mr. Cochran) Let's take a look at --
7          MR. COCHRAN: I only have one copy of these,
8    so I don't know how you guys want to enter what has been
9    produced to me today.
10         MS. COX: What is it?
11         MR. COCHRAN: It's the two FIR reports.
12   There's 2019.
13         MS. COX: A .1 and a .2 for a total of five
14   pages. And the .2 appears to include a screenshot of
15   the -- I think it's the RMS.
16         MR. COCHRAN: I just have four pages.
17         MS. COX: What is your last page on the .2?
18   Because it's not part of the report.
19         MR. COCHRAN: 834. Page 2 of 2.
20         MS. COX: Yep. Why don't you take a look at
21   it, and then you can use that if you would also.
22         MR. COCHRAN: And this has five pages?
23         MS. COX: No, I had something attached to
24   the back.
25         MR. COCHRAN: Okay. Well, I have what you

Page 98

1    gave to me earlier. I just want to be able to enter it
2    as an exhibit.
3          MS. COX: You can use that because I have
4    another one.
5          MR. COCHRAN: Perfect. Okay. I'm going to
6    ask that these be marked separately.
7          A. Am I still using that or can I put this aside?
8          Q. (By Mr. Cochran) Just keep that to the side if
9    you would.
10         MR. COCHRAN: And I will ask Barbara to mark
11   .1.
12         (Exhibit No. 7 marked.)
13         Q. (By Mr. Cochran) So our court reporter has
14   marked Exhibit 7, and that is Incident No. 2019401679.1,
15   and that consists of two pages. They are printed on
16   November 13th, 2023, at 5:31 p.m. Printed by Gary -- or
17   Roberts, Gary J. That has an entered on date of
18   November 11th, 2023, and an approved on date of
19   11/13/2023 entered by T, as in Tom, 74975 - Roberts,
20   Gary J., and approved by it says Automated Policy.
21         On the second page, the narrative reads, "This
22   report is being generated by Internal Affairs as there
23   were Linkless Supplemental Reports written regarding
24   this but no General Port was ever -- Report, excuse me,
25   was ever created for them to attach to:

Page 99

1          "I certify (or declare) under penalty of
2    perjury under the laws of the State of Washington that
3    the foregoing is true and correct," and that's signed by
4    Gary Roberts in Pierce County on November 13th of 2023."
5    I will hand you that.
6          Separately I will ask that report 2019401679.2,
7    again, there's two pages, and it appears to be again
8    printed out by Gary Roberts on November 13th, 2023, I
9    will ask that that be marked as Exhibit 8.
10         (Exhibit No. 8 marked.)
11         Q. (By Mr. Cochran) Officer Bain, looking at
12   Exhibits 7 and 8 and specifically Exhibit No. 8, can you
13   describe for the record what Exhibit 8 is?
14         A. It is an Enforcer Supplemental Report that I
15   completed on the date of the event, 7/12/2020.
16         Q. Is Exhibit 7 then, is that a report that you
17   also created?
18         A. It is not.
19         Q. Okay. So with regard to Exhibit 8, what is the
20   supplemental report supplementing?
21         A. It was our -- if we were to supplement a
22   report, it would be our understanding that another
23   officer would have wrote a general report. And since
24   Officer Cheney was the main contact, it would have been
25   our assumption, and I don't recall whether we had a

Page 100

1    conversation about it or not, but it would have been our
2    assumption that Officer Cheney would have written the
3    general report.
4          Q. And when you say "our assumption," who are you
5    speaking of?
6          A. Any other officer that would have been there
7    that would have written -- I'm sorry -- would have
8    written a supplemental report. I was speaking in
9    generalities. My apologies.
10         It would have been my assumption that Officer
11   Cheney would have written a .1, a general report.
12         Q. Okay. That assumption assumes that there is an
13   incident number, in this case 201940167, and then this
14   is .2, right?
15         MS. COX: Correction. I think you left one
16   digit off the case report.
17         Q. (By Mr. Cochran) I'm sorry. Let me say it
18   again. Incident No. 2019401679. Did I read that
19   correctly?
20         A. That's correct.
21         Q. Okay. So where did you get that incident
22   number in order to create a .2 supplemental report?
23         A. Incident numbers are created by South Sound 911
24   dispatch.
25         Q. Okay. And how did you know how to link to that

25 (Pages 97 to 100)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

---

Page 101

1    incident number from South Sound 911 dispatch?
2         MS. COX: Objection; form.
3         Answer if you can.
4         A.   When we're on a call, we're attached to --
5    we're put on a CAD call, our CAD call and Enforcer
6    report writing systems talk to each sorry.
7         So if I were to open the Enforcer program and
8    click on supplemental report to create a supplemental
9    report, I would click on a box to create the report, and
10   it would say -- it would give me a list of calls that
11   I've been on given the parameters -- search parameters
12   that I would enter, 2, 3, 4, 5 days, however many days I
13   had on there, and I could just click on that incident,
14   and it would pull over -- pull over the incident
15   information into the Enforcer report such as date, time,
16   stuff like that.
17        Q.   Okay.  So I'm going to refer you back to
18   Exhibit No. 5.  Yep.  Exhibit No. 5, which is the CAD
19   incident query of July 12th of 2020.
20        There's a complaint number in bold in the upper
21   left, and the complaint number on Exhibit No. 5, the CAD
22   Incident Inquiry, is 2019401679, correct?
23        A.   Yep.
24        Q.   And that's the corresponding complaint number
25   to the FIR Tacoma Police Department Supplemental Report

---

Page 102

1    which is in front of you as Exhibit No. 8, correct?
2         A.   Yep.
3         Q.   And so explain to me, and understand that I
4    don't know the computer system for the Tacoma Police
5    Department or for South Sound 911, how would you
6    manually go about linking the complaint number in the
7    Cad Incident Inquiry in Exhibit No. 5 to the FIR Tacoma
8    Police Department Supplemental Report in Exhibit No. 8?
9         A.   I'm sorry.  I thought I just did.  We have a
10   CAD system, which creates the CAD calls and information
11   that's created by dispatch.  They create the incident.
12   If I were to go out here and contact somebody, dispatch
13   would create the incident and location, date, time, my
14   information.
15        That CAD system program communicates with our
16   Enforcer report writing system.  So when I open the
17   Enforcer system and I say -- either click on a general
18   report if I'm going to do a general or a supplemental
19   report, I would click on -- click on that key to create
20   one of those, and then it would give me a list of calls.
21        If I just want to do the ones I've been on that
22   day, I can -- there's a box where I can type in the
23   incident number, and it would pull information from CAD
24   and put it and start to create the Enforcer report.  It
25   would have some information in there but a lot of it

---

Page 103

1    would be omitted.  It would have date, time, location,
2    stuff that is in the CAD.  Some of it is pulled over,
3    some of it, it just doesn't translate.  That's how those
4    two communicate with each other.
5         Q.   So let me ask you more physical characteristics
6    of how this was created.
7         Do you know where you were located?  Were you
8    in your patrol car or were you back at the substation
9    when you created what's been marked as Exhibit 8?
10        MS. COX:  Objection; form.
11        Answer if you can.
12        A.   I don't recall.  But it would have been likely
13   that I would have got -- myself and Officer Levitt would
14   have gone back to the substation.
15        Q.  (By Mr. Cochran)  Okay.  Are there ever
16   instances where you fill out an incident like the Tacoma
17   Police Department supplemental report which is
18   identified as Exhibit No. 8 inside a patrol unit?
19        A.   Yes, that's very common.  And let me further
20   explain, it's most likely done on the same computer.  If
21   we have a laptop in our cars.  We can remove it and take
22   it into the substation, plug it into a power source so i
23   doesn't die.
24        When I write a report, I do it on my laptop.  I
25   almost never write a report on a desktop computer at a

---

Page 104

1    substation.  So it would have been done on the same
2    computer.
3         Q.   Okay.
4         A.   If that helps clarify.
5         Q.   It does.
6         So is it your expectation that you would have
7    been able to pull up Cad Incident Inquiry with the same
8    complaint number, which is identified as Exhibit 5,
9    click on a hyperlink maybe on that number, which is the
10   complaint number in the top left of No. 5, and then it
11   would subsequently create the supplemental report which
12   is exhibited in No. 8?  Is that how it's done?
13        A.   I can try to explain it better.
14        Q.   Yeah, because here's what I'm having trouble
15   with is you say that you were able to pull up the CAD
16   incident inquiry from that evening; is that correct?
17        A.   When we log into our CAD program at the
18   beginning of every shift, it's -- it's a -- it's a
19   window that can always be up or we can minimize it when
20   we're logged in where we have activity within the CAD.
21        Q.   Right.
22        A.   You know, we get put on a call, it's already on
23   our computer.  It's a program that is running, so that
24   information is already there.  And then this type of
25   program is our Enforcer report writing program -- two

---

26 (Pages 101 to 104)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 105

1    separate programs, so I don't need to pull up CAD. It's
2    already -- the information is already there.
3        Q.  So when you want to create a supplemental
4    report, what do you type in?  You said that the number
5    at the top of No. 8 has already been generated for you.
6        So the incident number, and, again, it has that
7    same complaint number, which is on the CAD incident
8    inquiry, that number automatically populates, right?
9        A.  It can.
10       Q.  Okay.  Or you can copy and paste it in there?
11       A.  Or type in the incident number, yes.
12       Q.  Okay.  So it's your expectation that with
13   regard to Exhibit No. 8, you either had it auto
14   populated or you typed it in, typed in the number; is
15   that right?
16       A.  If I'm -- my common practice, and I don't
17   recall exactly what I did that night, but my common
18   practice is to open up the program for Enforcer.  I
19   would have clicked on the supplemental report link,
20   which would have brought me to a window where I could
21   either enter in the case number directly or it auto
22   populates the calls I've been on within the recent field
23   that I have it limited to of however many days I have it
24   limited to.  I try to keep it short so it doesn't get
25   too long and the program doesn't bog down.

Page 106

1        So I would have clicked on that call and then
2    would have put create report, and then it goes from the
3    window, and it starts to create what looks like this on
4    a computer screen.
5        Q.  And just so Barbara's record is clear, you are
6    holding up --
7        A.  My report.  It looks kind of like this but in
8    separate windows with separate tabs.
9        Q.  I see.
10       And then when you finalize that report, where
11   does the report go?
12       A.  When I click submit, if it's a supplemental
13   report, from my experience in dealing with supplemental
14   reports, it hangs out into whatever sphere, electronic
15   universe that saves them, whatever cloud system saves
16   these reports until it can attach itself to a general .1
17   report.
18       So if I write a supplemental report and there's
19   never ever a .1 report, it stays there until however
20   long the system saves that information.  And I don't
21   have that information.  That's a South Sound 911
22   question.
23       Q.  So based on your experience, if one were to
24   simply type in that same incident number which is
25   referenced as a complaint number in the Cad Incident

Page 107

1    Inquiry, is it your understanding that your FIR, your
2    field incident report, should have been available?
3        A.  When -- if it doesn't attach itself to a call,
4    there's nothing that we're going to be able to see.
5    From my experience, because I have accidentally created
6    supplemental reports when I should have created a .1.
7    And in order to remedy that, I have to call the South
8    Sound 911 help desk.
9        I've tried to look up those in the past using
10   the resources that I have in my computer, and I can't
11   see them once I've submitted the supplemental report if
12   there's no general report to attach itself to.  So I
13   have to call south Sound 911 help, the number that they
14   give us.  They say, yes, we can see this.  We can push
15   it back.  We can delete it, and you can just start all
16   over again.  And then -- but it's nothing that I can
17   see.
18       Q.  In this particular case, and I don't -- I'm not
19   asking for what you've talked about with either Ms. Cox
20   or Ms. Taylor, how was this report printed out by Gary
21   Roberts?  What's your understanding?
22       MS. COX:  Objection; form.
23       Answer if you can.
24       A.  I don't know.
25       Q.  (By Mr. Cochran)  Did you -- was it your

Page 108

1    understanding before today's deposition that you had
2    created a supplemental report?
3        A.  I didn't -- I actually did not have a
4    recollection of creating a supplemental report.
5        Q.  Okay.  So the first time that you saw that you
6    had created a supplemental report was sometime in the
7    days prior to your deposition; is that right?
8        A.  So last night, I got an email about this
9    incident.  It was late last night.  I was -- I was
10   reviewing some of the previous calls that I had that
11   were 15 years ago because they are well beyond my
12   memory.
13       And so -- and then I got an email on my work
14   computer saying that, you know, you need to correct this
15   report.  I was, like, well, that's from years ago.  I
16   don't know why that's up there, so I dismissed it.
17       When I got in this morning, I was made aware of
18   this particular report about 9:30 this morning.
19       Q.  So let me walk you back just a minute.  You got
20   an email when?
21       A.  Last night.
22       Q.  You got an email last night that said this
23   report exists.  You need to dismiss it?
24       A.  No, it said fix it.  I need to do some type of
25   fixing before it can be approved.  And I saw -- it just

27 (Pages 105 to 108)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 109

1   had the case number.  It didn't have any names or
2   identifier -- or anything identifying it with this
3   incident.  I didn't recognize the case number, so I
4   dismissed the email.  I was going to dismiss it until I
5   got in this morning because I had more important things
6   to do than worry about a case from three years ago, and
7   I didn't recognize it from this incident.
8       Q.  Okay.
9       A.  Because I didn't have the case number
10  memorized.
11      Q.  Okay.  So that was the first time you had ever
12  gotten an email that said when you need to fix this?
13      A.  Yes.
14          And then when I got in this morning is when I
15  was made aware that that same email had to do with this
16  supplemental report that I had written on that date that
17  I forgot I had written.
18      Q.  What are the chances that that happens just
19  before your deposition?  Do you get emails like this all
20  the time?
21          MS. COX:  Objection; form.
22          And if you want some insight off record, I can
23  help you with that.
24          MR. COCHRAN:  No, not right now.
25      A.  The first time I've ever gotten an email like

Page 110

1   this.
2       Q.  (By Mr. Cochran)  Okay.  Let's go to the
3   narrative in what is your -- and you recognize you've
4   looked at this.  You recognize this as being a narrative
5   that you, Christopher Bain, submitted to the Tacoma
6   Police Department computer system on or about July 12th
7   of 2020; is that right?
8       A.  That is correct.
9       Q.  You didn't have a recollection of it before.
10  But after seeing it, you recall making this report?
11      A.  Yes.
12      Q.  It says, "On 7-12-20 at 2054 hours, Officer E.
13  Levitt and myself were in full duty uniform in a two man
14  car when we responded to Tacoma General Hospital to
15  assist Officer Cheney with an intimidation with a
16  weapon."  Let's stop there for a moment.
17          Did you see anywhere in Exhibit 4 that you and
18  Officer Levitt actually responded to Tacoma General
19  Hospital?
20      A.  4 or 5?
21      Q.  No. 5.  Did I say 4?  I apologize.  No. 5.
22      A.  No.
23      Q.  So it didn't exist within the Cad
24  Incident Inquiry that you and Erik Levitt had responded
25  to Tacoma General Hospital, right?

Page 111

1       A.  I would have labeled it Tacoma General because
2   in the CAD it said Mary Bridge Children's Hospital, the
3   same building, and I often refer to that same building
4   as Tacoma General Hospital.  That's why I would have
5   made that notation because the incident report was from
6   -- was at Mary Bridge Hospital.
7       Q.  But you didn't respond and neither did Erik
8   Levitt to either Tacoma General Hospital or Mary Bridge,
9   did you?
10      A.  No.
11      Q.  And in fact, I will have you take a look at
12  this Cad Incident Inquiry that has a different complaint
13  number.
14          (Exhibit No. 9 marked.)
15      Q.  (By Mr. Cochran)  And, Officer Bain, I'm
16  handing you what's been marked now for identification as
17  Exhibit 9.  And I will represent to you that this is a
18  document that was made available by South Sound 911 and
19  through the City of Tacoma.  It's got markings at the
20  bottom Contreraz 235.
21          The Cad Incident Inquiry here has a complaint
22  number 2019401738.  But below it in Cross Referenced
23  Events, it's about halfway down, you'll see Complaint
24  No. 2019401679.  Do you see that?
25      A.  I do.

Page 112

1       Q.  Okay.  And you would agree with me that based
2   on the call received time, which is 7/12 of 2020, that's
3   the date, at 2104, that the Cad Incident Inquiry in
4   Exhibit No. 9 is related to the Cad Incident Inquiry in
5   Exhibit No. 5, correct?
6           MS. COX:  Objection; form.
7           Answer if you can.
8       A.  It doesn't necessarily mean it's related, but
9   it is cross referenced.
10      Q.  (By Mr. Cochran)  Here we've got some sort of
11  report of a missing 13 year old.  Joel Cheney appears to
12  be the officer that was responding.  Do you see that?
13      A.  I do.
14      Q.  Okay.
15          So in the supplemental report that you made at
16  or about the end of your call at Wright Park on 7/12 of
17  20, July 12th of '20, it's incorrectly -- it's incorrect
18  in that it states that you and Officer E. Levitt
19  responded to Tacoma General Hospital to assist Officer
20  Cheney, correct?
21      A.  Sometimes we -- I won't say it's incorrect.  If
22  we are initially going to a certain location, we would
23  document that.  And if that location changes to Wright
24  Park, which is right next to TG, that would be
25  documented as well.  Just because in the beginning it

28 (Pages 109 to 112)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 113

1 will say we responded to, it doesn't mean that we
2 actually arrived at that location. We could be
3 responding to one location and be diverted to another
4 based on the circumstances of the incident.
5     Q. Okay. Well, we'll get to that in a moment.
6         But at least nowhere that you have seen in
7 Exhibit 5 or Exhibit 9 does it say that you and Officer
8 Levitt actually went to Tacoma General Hospital, right?
9         MS. COX: Objection; form.
10        A. We did not go to Tacoma General Hospital. That
11 is correct.
12        Q. (By Mr. Cochran) It says, "Officer Cheney had
13 contacted the victim and said that a" -- I believe
14 that's black male, it says, "B/M with a muscular build,
15 who was wearing a do rag, black tank top, and dirty
16 white shoes pulled a knife on him and a white male who
17 had red hair and was wearing a black T-shirt and black
18 shorts pulled a gun on him at the basketball courts at
19 Wright Park."
20        Did I read that correctly?
21        A. Yes, you did.
22        Q. Okay. You wrote a black male with a muscular
23 build who was wearing a do rag, a black tank top and
24 dirty white shoes. First of all, did you see anywhere
25 in Exhibit 5 a mention of dirty white shoes?

Page 114

1     A. I don't recall seeing anything on there that
2 said dirty white shoes, no.
3     Q. It's an important detail that you put in your
4 supplemental report marked as Exhibit 8 but nowhere
5 to be found in the Cad Incident Inquiry, correct?
6         MS. COX: Objection; form.
7     A. That's correct.
8     Q. (By Mr. Cochran) Here you've identified the
9 black male as wearing a black tank top and dirty white
10 shoes and then the white male as wearing a black T-shirt
11 and black shorts.
12        Is that consistent with Exhibit No. 5, the Cad
13 Incident Inquiry?
14        MS. COX: Objection; form.
15        Answer if you can.
16        A. Information that is in CAD often changes while
17 we're on scene, and we wouldn't necessarily enter
18 information into CAD and instead document it in the
19 report. It would be redundant to document it in two
20 ways, in CAD and in an official Enforcer report.
21        So instead of entering that information in CAD,
22 we often include more detailed information in the
23 Enforcer report. So information that might not be in
24 CAD will most definitely be included in an Enforcer
25 report.

Page 115

1     Q. (By Mr. Cochran) On the first page of No. 5,
2 again, the Cad Incident Inquiry, the black male is
3 described as having a gray tank top and long black
4 shorts, but that's not what you put in the report,
5 correct?
6     A. I did not include the shorts in the description
7 in my narrative.
8     Q. Your narrative in Exhibit 8, correct?
9     A. Correct.
10    Q. And in fact, there is nowhere within Exhibit
11 No. 5, the Cad Incident Inquiry of July 12th of 2020,
12 where it's ever said that the black male who was the
13 alleged suspect carried a knife had a black tank top,
14 correct?
15    A. I don't -- I don't see that in the CAD call at
16 all. That could have been information that we learned
17 on scene, but it wasn't necessarily in the CAD. It
18 could have been relayed via police radio.
19    Q. Really important though to document that,
20 correct?
21    A. It could --
22        MS. COX: Objection; form.
23        Answer if you can. I think you answered. I
24 didn't hear it.
25    A. It could be, correct.

Page 116

1     Q. (By Mr. Cochran) And based on past
2 disciplinary actions, you know how important it is to
3 document everything in reports, correct?
4         MS. COX: Objection; form.
5     A. Yes, I do. I'm also human and might leave out
6 something in a typo. And I have also said that I often
7 write reports in Word and cut and paste, and sometimes
8 the stuff doesn't -- might not make it over or I will
9 make a correction in a report, and I proofread my own
10 reports. Sometimes I do miss some things.
11    Q. (By Mr. Cochran) Did you open a Word document
12 to create this narrative to the best of your knowledge?
13    A. To the best of my knowledge. I don't recall if
14 I did, but it would have been my common practice.
15    Q. Where would you keep that Word document if you
16 did?
17    A. I don't -- I don't save the Word documents. I
18 type it in Word for, as I said before, spelling and
19 grammar, and then I cut and paste it over to Enforcer,
20 and that's where I save it.
21    Q. Ultimately do you keep a draft of those Word
22 documents that you create?
23    A. No.
24    Q. Where do they go? You just hit don't save, and
25 then they disappear wherever Word is stored; is that

29 (Pages 113 to 116)

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 117

1    right?
2        MS. COX: Objection; form.
3        A. Correct.
4        Q. (By Mr. Cochran) The next portion, if we begin
5    the second paragraph of Exhibit No. 8, the Tacoma Police
6    Department supplemental report produced just prior to
7    your deposition it reads, "We went to Wright Park to
8    conduct an area check for the suspects."
9        Would you agree with me that that would lead
10   the reader to believe that you left Tacoma General
11   Hospital and then went to Wright Park?
12       A. I couldn't tell you what a reader would
13   believe.
14       Q. Did you mean it to be that you were at Tacoma
15   General where you responded, and then you went to Wright
16   Park?
17       MS. COX: Objection; form.
18       A. No, because I never indicated in my report that
19   I arrived at Tacoma General.
20       Q. (By Mr. Cochran) So responded to Tacoma
21   General does not mean that you actually arrived there;
22   is that right?
23       MS. COX: Objection; form.
24       A. Correct.
25       Q. (By Mr. Cochran) At 21 -- oh, sorry. Yeah,

Page 118

1    "At 2105 hours, Officer Levitt located a muscular build
2    black male who was wearing a black tank top and a black
3    hat and white shoes sitting at a picnic table on the
4    east side of the park near the observatory at South 3rd
5    Street -- 3rd and G Street."
6        Did I read that correctly?
7        A. You did.
8        Q. Okay. Before you said that you were not
9    concerned about what individuals looked like because you
10   were there to assist Officer Cheney, correct?
11       A. That is not correct. Again, I will correct you
12   and say that I was -- I had never said that that was not
13   concern. I would appreciate if you would stop saying
14   that.
15       Q. Okay. That was not a part of what you were
16   looking for, I think, is the way that you said it
17   previously; is that right?
18       A. Yes. Thank you.
19       Q. Okay. So despite the fact that you were not
20   looking for any individual -- any particular individual
21   because you were there to assist Officer Cheney, right?
22       A. That was to the best of my recollection is what
23   we were there doing, yes.
24       Q. Okay. Here it says that Officer Levitt
25   actually located a muscular build black male who was

Page 119

1    wearing a black tank top and black hat and white shoes
2    sitting at a picnic table on the east side of the park
3    near the observatory at South 3rd and G Street.
4    Correct?
5        A. That's what the report says. That's correct.
6        Q. The report then says, and, again, this report
7    according to your testimony was made on that same
8    evening, right, on July 12th of 2020?
9        A. Correct. It would be a better representation
10   of what happened than my memory would be.
11       Q. Okay. "We got out to contact the male and were
12   joined by multiple other officers." That's not what you
13   testified previously, right? Before you had said that
14   Officer Cheney already had that individual either in
15   custody or detained and you were there just to help him,
16   right?
17       A. That was -- that was my recollection of the
18   events before reviewing this report.
19       Q. But you read this report before you testified
20   today, right?
21       A. I did not actually read this report before I
22   testified. I saw that it existed. I did not read it.
23       Q. "Officer Levitt assisted in placing the male,
24   who refused to identify himself, into double handcuffs."
25   Do you recall that?

Page 120

1        A. I don't recall that happening. If I had, I
2    would have testified to that before. But if it's in
3    here, it would have been a better recollection -- it
4    would have been a better account of the events than my
5    memory would be.
6        Q. "The male immediately became argumentative and
7    kept asking why he was put in handcuffs." Did I read
8    that correctly?
9        A. Yep.
10       Q. "Officer Cheney attempted to explain to him
11   many times why he was being detained, but he refused to
12   listen." Did I read that correctly?
13       A. Yes.
14       Q. "He just kept talking over the officers. I
15   attempted to engage him in conversation, but he kept
16   talking over me. So I tried to first calmly talk to
17   him, then attempted to control the conversation and talk
18   over him, but he refused to listen."
19       Did I read that correctly?
20       A. Yes.
21       Q. So in the narrative that you allegedly wrote on
22   the day of the incident, you weren't just there
23   assisting Officer Cheney, but you were actually engaged
24   in conversation with Mr. Contreraz, correct?
25       MS. COX: Objection; form.

30 (Pages 117 to 120)

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 121

1    Go ahead.
2    A. Correct, I was engaged in conversation.
3    Q. (By Mr. Cochran) You say next, "In between his
4    rants, he would blankly stare at me, then would start
5    ranting again claiming that we were only detaining him
6    because he was black. He was sitting on the edge of the
7    table and started to stand up."
8    Did I read that correctly?
9    A. Yes.
10   Q. "Either Officer Branham or Officer Cheney told
11   him to sit back down. He then took a step forward and
12   started to lean in towards Officer Branham." Did I read
13   that correctly?
14   A. Yes.
15   Q. "I reacted by grabbing his handcuffs and
16   applying equal rear pressure to get him to sit back down
17   the table." Did I read that correctly?
18   A. Yes.
19   Q. Is that what you would consider a contact
20   control?
21   A. Yes.
22   Q. "The pressure worked, and he sat back down. At
23   no time did he make any complaints of pain from me
24   grabbing his -- the cuffs. He did not make any noise
25   that would indicate he had been in pain." Did I read

Page 122

1    that correctly?
2    A. Yes.
3    Q. "Officer Cheney told the male that he was going
4    to get ahold of the victim to see if he was the suspect
5    we were looking for.
6    "Officer Cheney walked to his patrol vehicle to
7    call the victim. And while he did -- while he did so,
8    the male kept arguing and was only getting more
9    belligerent." Did I read that correctly?
10   A. Yes.
11   Q. What did you do, Officer Bain, if anything,
12   when you saw that your contact control in fact not
13   worked and according to you and your narrative that Zim
14   Contreraz was becoming more belligerent?
15   MS. COX: Objection; form.
16   A. The contact control actually did work because I
17   was more concerned about Mr. Contreraz sitting than I
18   was about him talking. I'm not concerned about somebody
19   talking. I'm concerned about somebody either running
20   away when they are being -- when they are detained or
21   making motions towards officers to hurt them. I'm not
22   concerned about -- about him talking.
23   Belligerent is more of a reference to his
24   speech than it is about -- about whether he's getting up
25   and trying to walk away or run away or assault another

Page 123

1    officer. So it did in fact work. As long as he's
2    sitting, he could be as belligerent as possible.
3    Q. The next portion reads, "He returned a few
4    minutes later and told the male that he was unable to
5    contact the victim so he would be releasing him." Did I
6    read that correctly?
7    A. Yes.
8    Q. Is that typical procedure based on your
9    experience at the Tacoma Police Department, if you are
10   simply unable to contact a victim, that you would let a
11   possible suspect leave the area?
12   MS. COX: Objection; form.
13   Answer if you can.
14   A. If we can not contact a victim, we do not have
15   a crime. There's no reason to further detain somebody
16   and burden them with being in police custody if we don't
17   have a victim to say whether they were the person who
18   assaulted them or not or committed the crime.
19   Q. (By Mr. Cochran) Not true in this case though,
20   right? Because we've already seen on the CAD No. 5 that
21   there was probable cause to arrest, correct?
22   MS. COX: Objection; form.
23   Answer if you can.
24   A. Whoever had contacted the victims said that
25   there was PC to arrest. But if those victims are no

Page 124

1    longer able to be contacted, then they could walk away,
2    they could say that they don't want to be a victim. And
3    if we're not able to further contact them, then we're
4    not able to keep them in custody and book them in a
5    crime. We don't have a victim.
6    Q. Officer Bain, you are not testifying here under
7    oath today that simply being unable to get ahold of a
8    victim at that particular time would mean that probable
9    cause did not exist anymore and that it would be okay to
10   release a suspect? Are you testifying as to that?
11   MS. COX: Objection; form.
12   A. Yes. If the victim does -- no longer wants to
13   be a victim and doesn't want to be contacted, we no
14   longer have a crime.
15   Q. (By Mr. Cochran) That's not what this says.
16   MS. COX: Objection.
17   Is there a question?
18   Q. (By Mr. Cochran) Correct?
19   MR. COCHRAN: I'm trying.
20   MS. COX: It looks like you are arguing with
21   the witness.
22   Q. (By Mr. Cochran) This is not what this says,
23   does it, Officer Bain. It doesn't say that the victim
24   didn't want to be contacted. It just says that Officer
25   Cheney was unable to contact the victim, correct?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Contreraz v. City of Tacoma, et al.                    Officer Christopher Bain

Page 125

1     A.  That's what that says.
2         Q.  Don't you agree that it's unusual that a simple
3     attempt to contact a victim during the heat of the
4     moment when probable cause has already been established
5     according to the Cad Incident Inquiry, that it's unusual
6     just to release an alleged suspect?
7         MS. COX:  Objection; form.
8     A.  No, it happens more often than you would think.
9         Q.  (By Mr. Cochran)  The next portion says, "We
10    took him out of handcuffs, and he kept arguing and
11    yelling that we had contacted him because he was black.
12    He told us we could search his backpack and Officer
13    Cheney told him that he did not need to search it."
14        Did I read that correctly?
15    A.  Yes.
16        Q.  Are you testifying that based on your report
17    that despite the fact that there were concerns about a
18    black individual who possibly had a knife, that Officer
19    Cheney told him he didn't need to search his bag?
20        MS. COX:  Objection; form.
21        Answer if you can.
22    A.  That is exactly what Officer Cheney said at the
23    time and I documented in my report.
24        Q.  (By Mr. Cochran)  Did you agree with Officer
25    Cheney's decision not to search the backpack of an

Page 126

1     alleged suspect of an intimidation with a weapon?
2         MS. COX:  Objection; form.
3     A.  If we were unable to contact the victim, which
4     is what Officer Cheney had said, there would be no
5     reason to search the backpack.
6         Q.  (By Mr. Cochran)  What about finding the knife
7     inside of it?  Wouldn't that substantiate the probable
8     cause that's already been listed as existing in the Cad
9     Incident Inquiry?
10        MS. COX:  Objection; form.
11    A.  We didn't have -- we didn't have a description
12    of the knife, like, such as black handle or red handle,
13    black knife, silver knife.
14        So just because he had a knife doesn't mean
15    that that would have been the knife used in the crime.
16    So it would have not reestablished the probable cause or
17    even helped the probable cause just because of the fact
18    he had a knife.
19        Q.  (By Mr. Cochran)  The next portion of your
20    supplemental report written on or about July 12th of
21    2020, says, "The male then dumped out his backpack.
22    Officer Cheney asked the male if he would like to talk
23    to a supervisor about the incident, and he said that he
24    would."
25        So he didn't demand to see a supervisor.

Page 127

1     Officer Cheney asked him; is that right?
2     A.  That's what I put in my report, yes.
3         Q.  And then it says, "Sergeant Jepson was advised
4     and said he was responding and advised us to clear the
5     scene to deescalate the situation."
6         Did I read that correctly?
7     A.  You did.
8         Q.  Is that the entirety of the report as you
9     understand it?
10    A.  Yes, it is.
11        Q.  Would you agree with me that there is no
12    mention whatsoever that Zim Contreraz either slurred his
13    words, that he was highly intoxicated or that he was
14    impaired in any way?
15    A.  It was not in the report.
16        Q.  Correct.  You didn't write it, did you?
17    A.  I didn't -- I wrote the report.
18        Q.  Right.  But you never wrote in your report the
19    things that you testified to previously, correct?
20        MS. COX:  Objection; form.
21    A.  Just -- just that he was belligerent.
22        Q.  (By Mr. Cochran)  Right.
23        You did not include your testimony that you
24    could smell alcohol on his breath, right?
25    A.  I did not.

Page 128

1     Q.  You did not include that he was highly
2     intoxicated, which is what you testified before,
3     correct?
4     A.  Correct.
5         Q.  None of those things exist within the
6     contemporaneous report that you say you authored on July
7     12th of 2020, right?
8     A.  Correct.
9         MS. COX:  Objection; form.
10    A.  Correct.
11        Q.  (By Mr. Cochran)  and We've already talked
12    about the fact that if those are things that you
13    observed, it was really important for you to include it
14    in the report, right?
15    A.  We didn't -- we weren't talking about an
16    Enforcer report then.  You were talking about if I would
17    have relayed those to Sergeant Jepson regarding the use
18    of force.
19        You didn't say -- we didn't say put it in the
20    Enforcer report.  So I believe we need to -- we need to
21    be specific about -- about that.
22        Q.  (By Mr. Cochran)  Do you recall me asking about
23    your training as a DUI officer?
24    A.  Yes.
25        Q.  And your report about -- your training about

32 (Pages 125 to 128)

Contreraz v. City of Tacoma, et al.                                          Officer Christopher Bain

Page 129

1  being able to recognize when someone is impaired or
2  under the influence?
3          A.  Yes.
4          Q.  Okay.  You agreed with me, again, based upon
5  past disciplinary action that you're required to
6  include as much detail in reports as possible, right?
7          A.  Sure.
8          Q.  That did not happen in this case, did it?
9              MS. COX:  Objection; form.
10         A.  I included the -- I documented the things that
11 I felt needed to go in this report.  If I left out the
12 fact that he was intoxicated and didn't have anything to
13 do with the crime, but I put down his actions and the
14 fact that he was belligerent.  It's not illegal to be
15 intoxicated in public.
16         Q.  (By Mr. Cochran)  It's not illegal to be
17 belligerent either?
18         A.  No, but it goes towards his actions.
19         Q.  And it's not illegal to be black hopefully,
20 right?
21             MS. COX:  Objection; form.
22         A.  Can you rephrase that question, please?
23         Q.  (By Mr. Cochran)  Yeah.  I'm trying to figure
24 out what you decide is important to put in a report and
25 what you decide is not.

Page 130

1              You testified before that you could smell
2  alcohol on him, that his words were all slurred, that
3  his -- I think you used the word fat, but basically he
4  couldn't formulate words?
5          A.  I said thick and slurred speech.
6          Q.  Thick and slurred speech.
7              You can remember those things as you sit here
8  today?
9          A.  Yes.
10         Q.  You volunteered those things in testimony.  I
11 didn't ask you about that, right?
12         A.  Correct.
13         Q.  You never put that in your report back on July
14 12th of 2020?
15         A.  Correct.
16             MS. COX:  Objection; form.
17         A.  Correct.
18         Q.  (By Mr. Cochran)  It was important today now
19 that you are being named in a lawsuit by Mr. Contreraz,
20 but it wasn't important in the report back in July of
21 2020, correct?
22             MS. COX:  Objection; form.
23         A.  As somebody who specializes in impaired driving
24 and DUI enforcement and recognizes that, it's something
25 that is very evident to me as something that I usually

Page 131

1  recognize but doesn't always need to be included in a
2  report.
3          Q.  (By Mr. Cochran)  Wait a second.  As a person
4  who deals with DUI enforcement, you recognize that
5  people are impaired, but you say that that's not always
6  important to include in your reports?
7          A.  Yeah.
8          Q.  Officer Bain, are you aware that there were two
9  other people who were on site at the time who say that
10 they witnessed your actions and your interactions with
11 the plaintiff, Mr. Contreraz, in this case?
12         A.  Yeah, we discussed that prior.
13         Q.  Are you aware that they both have offered up
14 statements, it's in the tort claim form, that they
15 offered up statements that you in fact grabbed
16 Mr. Contreraz, not from his right side but from his left
17 side, that you pulled down on the handcuffs, which sent
18 his whole body back, and he hit his head against the
19 picnic table?
20             MS. COX:  Objection.
21         Q.  (By Mr. Cochran)  Are you aware of that?
22             MS. COX:  Objection; form.
23         A.  I was not aware of the details, but I was aware
24 that there were some people in the park.
25         Q.  (By Mr. Cochran)  And you were aware that their

Page 132

1  testimony or at least their recollections are understood
2  to be much different than your recollection of your use
3  of force with Mr. Contreraz, correct?
4              MS. COX:  Objection; form.
5          A.  Based on what you are telling me, it would
6  appear that they are different recollections of the same
7  event.
8          Q.  (By Mr. Cochran)  And would you agree with me
9  that the only way that we're going to be able to figure
10 out who is telling the truth is to allow a finder of
11 fact to hear the circumstances and judge credibility as
12 to whether your recollection is correct or whether their
13 recollection is correct?
14             MS. COX:  Objection; form.
15             If you can answer.
16         A.  Well, even then it's one person's opinion,
17 isn't it?
18         Q.  (By Mr. Cochran)  Not an opinion but what their
19 recollection is, right?
20             MS. COX:  Same objection.
21         A.  Well, would you agree that we can have a
22 collision scene and have five witnesses and each of the
23 five people will probably give a different account of
24 what happened but not -- there would be some similar
25 facts but not all the same?

Contreraz v. City of Tacoma, et al.                                    Officer Christopher Bain

Page 133

1    **Q.  (By Mr. Cochran)  I do.**
2    A.  Okay.
3    **Q.  And I also agree, and wouldn't you, that that's**
4    **something that ultimately needs to be decided by a jury?**
5    MS. COX:  Objection; form.
6    A.  Well, you called it a finder -- a finder of
7    fact.
8    **Q.  (By Mr. Cochran)  Correct.**
9    A.  Okay.  But it's still an opinion.
10   **Q.  Well, would you agree with me that it needs to**
11   **be decided as to whose credibility is -- the weight of**
12   **the credibility -- strike that.**
13   **Would you agree with me that someone needs to**
14   **hear both versions and decide who they believe is more**
15   **credible?**
16   MS. COX:  Objection; form.  Continuing
17   objection to this line of questioning regarding legal
18   matters this witness is not qualified to answer.
19   MR. COCHRAN:  Noted.
20   **Q.  (By Mr. Cochran)  Go ahead and answer, if you**
21   **can.**
22   A.  That's not for me to say or decide.  That's for
23   the legal system that this country has created to
24   decide.
25   MS. COX:  Further, if I can add, we don't

Page 134

1    have a statement from Chrissie Wade.  You said both
2    witnesses.  There's only one from Seth.  So if you have
3    two, we would like that to be provided.
4    MR. COCHRAN:  That's a nice statement.
5    **Q.  (By Mr. Cochran)  Are you aware that at least**
6    **so far no other responding Tacoma police officer has any**
7    **recollection of this event?**
8    MS. COX:  Object --
9    A.  Go ahead.
10   MS. COX:  Was that you --
11   THE WITNESS:  That was me.
12   MS. COX:  Objection; form.
13   THE WITNESS:  I haven't talked to any
14   officers on the recollection of this event.
15   **Q.  (By Mr. Cochran)  Does that include Erik**
16   **Levitt?**
17   MS. COX:  Same objection.
18   A.  That is correct.
19   **Q.  (By Mr. Cochran)  Does that include Officer**
20   **Branham?**
21   MS. COX:  Same objection.
22   A.  That is correct.
23   **Q.  (By Mr. Cochran)  How about Officer Franco?**
24   MS. COX:  Continuing objection same line of
25   questions.

Page 135

1    Go ahead.
2    A.  That is correct.
3    MR. COCHRAN:  I think that's all the
4    questions I have.
5    MS. TAYLOR:  Okay.
6    MS. COX:  Thank you.
7    Can we take a break --
8    MR. COCHRAN:  Sure.
9    MS. COX:  -- and then hopefully we'll cut
10   everybody lose?
11   THE VIDEOGRAPHER:  Going off the record at
12   1:41.
13   (Recess was taken from 1:41 p.m. to
14   1:48 p.m.)
15   MS. TAYLOR:  And for the record, Jennifer
16   Taylor on behalf of the defendants.  We're not going to
17   ask any questions at this time.  So we'll reserve
18   signature, and we'll take a copy, an E-Tran, please.
19   THE COURT REPORTER:  And do you want to
20   order?
21   MR. COCHRAN:  I will order, please.
22   (Deposition concluded at 1:48 p.m.)
23   (By agreement between counsel and witness,
24   signature was reserved.)
25   * * * * *

Page 136

1    C E R T I F I C A T E
2
3    STATE OF WASHINGTON
4    COUNTY OF KING
5
6    I, Barbara K. Castrow, a Certified Court Reporter
7    in and for the State of Washington, do hereby certify
8    that the foregoing transcript of the deposition of
9    Officer Christopher Bain, having been duly sworn, on
10   November 14, 2023, is true and accurate to the best of
11   my knowledge, skill and ability.
12   IN WITNESS WHEREOF, I have hereunto set my hand
13   and seal this 28th day of November, 2023.
14
15
16
17
18   Barbara K. Castrow, CCR, RMR, CRR
     Certified Court Reporter #2395
19
20   My certification expires:
     November 24, 2024
21
22
23
24
25

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989